THE COURT OF APPEALS OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONALD F. WYATT, | ) | |
| | ) | Court of Appeals No. A-5291 |
| Appellant, | ) | Trial Court No. 1JU-S93-1416CR |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | [No. 3607 - May 14, 1997] |
| | ) | |

Appeal from the Superior Court, First Judicial District, Juneau, Larry R. Weeks, Judge.

Appearances: Margi Mock and David D. Reineke, Assistant Public Defenders, and John B. Salemi, Public Defender, Anchorage, for Appellant. Kenneth M. Rosenstein and Nancy R. Simel, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: Bryner, Chief Judge, Coats and Mannheimer, Judges.

COATS, Judge.

A jury convicted Ronald F. Wyatt of murder in the first degree for killing his wife, and two counts of tampering with evidence for hiding her body, in violation of AS 11.41.100(a) and AS 11.56.610(a)(1). Superior Court Judge Larry R. Weeks sentenced Wyatt to 99 years for murder and concurrent terms of five years for the tampering with evidence counts, to run consecutive to the 99 years. Wyatt appeals his conviction and sentence. We affirm.

_____

* Entered pursuant to Appellate Rule 214 and Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3).

EXHIBIT B
1 of 41

Ronald Wyatt and his wife Diane lived in Diane's home on the beach outside of Ketchikan. Diane had gradually become unhappy with their marriage. Her sister, Susan Vik, and other witnesses testified that Wyatt intimidated Diane, and dominated her until she found it unbearable. In 1990, the Wyatts went to Mexico on a vacation with their friends, Amber and Kenton Mathewson. At one point, Amber overheard Wyatt become angry and threaten to destroy Diane's home if she did not behave better.

During the first week of October, 1992, the Wyatts traveled to Seattle and met with Bruce Hinsdale, a marriage counselor. Diane told Hinsdale that she wanted a divorce, saying the "final straw" was when Wyatt threatened to "torch the house." Vik and Gretchen Sivertsen, Diane's daughter from a previous marriage, became concerned for Diane's safety. Diane had lunch with Vik on October 22, 1992, and told Vik that she had called a Ketchikan organization called Women In Safe Homes (WISH) seeking assistance in getting a divorce. Vicki Armstrong, a WISH employee, testified that a woman called, identified herself as Diane Wyatt, and set up an appointment for two days later to obtain information about getting a divorce.

Vik and Diane finished lunch at around 2:00 p.m. Diane said she was going to meet her friend Bob Luse at 2:30, but Luse said she never arrived. Vik and Sivertsen took turns calling the Wyatt home. They both reached Wyatt at around 7:30 p.m., who told them Diane was not home. Vik became concerned and around 9:30 drove to Diane's home with her boyfriend, Sven Karlsson. The car

- 2 -

3607

B 2 g 41

Diane had been driving was not there and Wyatt said Diane was gone. Vik and Karlsson drove to a school on North Point Higgins Road where they found the car Diane had been driving. Surmising that Diane had finally met up with Luse, Vik left a note in the car asking Diane to call her.

At about 10:30 p.m., Lloyd Hawn, a security guard at the Ketchikan Pulp Mill, discovered the Wyatts' Isuzu Trooper in the log sorting yard at Ward Cove. As Hawn was checking the vehicle's registration information, a man approached the vehicle. He was muddy from the waist down, acting nervous, and was breathing heavily. The man apologized for being on the property, but said he had taken some medication that caused him to search for a place to defecate. Hawn was later unable to determine if the man was Wyatt.

The next day, October 23, Vik was unable to contact Diane, and learned that she had not kept her 1:00 appointment at the WISH Center. Vik and other members of Diane's family descended upon Diane's home, searched the house, and confronted Wyatt when he arrived.

Searches for Diane were conducted, and on October 27, a search dog and its handler discovered Diane's body in the water near the log sorting yard in Ward Cove. The body was wrapped in a tarp and weighted down with two anchors and some chain. Diane had been hit in the head three times with a blunt object, fracturing her skull. She was also shot once in the head. Tamela McColley, a co-worker of Wyatt's, testified at trial that she and Wyatt had discussed a notorious crime in Ketchikan in which a woman killed

- 3 -

*3607*

B 3 of 41

her boyfriend and wrapped him in a tarp. McColley said that Wyatt commented that if he killed his wife, he would wrap her in a tarp, tie it securely, and weight it down so it would not be found.

Alaska State Troopers searched Diane's house and found cardboard boxes in the basement. Some were arranged neatly while others were in disarray. Luminal testing revealed a substance on the floor that might have been blood. Two droplets of blood were found on cardboard boxes in the basement, and DNA testing revealed it was consistent with Diane's blood, although the age of the blood was not determined.

It was later learned that about three weeks before Diane's death, there had been transfers of about $53,000 from Diane's personal accounts in a South Dakota bank into a joint account held by Ronald and Diane Wyatt, and a personal account of Ronald Wyatt. Terry Leberman, a co-worker of Wyatt, testified that he saw a letter on Wyatt's computer screen purportedly written by Diane, instructing the South Dakota bank to make the transfers. An FBI handwriting expert testified that the signature on the letter was a forgery, although he could not conclude that Wyatt had forged the signature.

Wyatt was indicted on one count of first-degree murder and two counts of tampering with evidence. When an impartial jury could not be impaneled in Ketchikan, venue was transferred to Juneau. Trial began on September 15, 1993, and lasted for five weeks. A jury convicted Wyatt of all charges.

3607

ß 4 of 41

Wyatt first contends that Judge Weeks abused his discretion by not granting Wyatt's motion for mistrial. The state called Vicki Armstrong, who was to testify that on October 21, 1992, while working at Women in Safe Homes, she received a call from a woman who identified herself as Diane Wyatt. The caller set up an appointment for October 23 to receive assistance in getting a divorce from her husband. Wyatt requested that the court direct Armstrong to refer to WISH only by its acronym, WISH, contending that if the full name were revealed, it would create the misconception in the jurors' minds that Diane was a physically abused woman. The court ruled that Armstrong could not refer to the organization's full name, "Women In Safe Homes." The prosecutor represented that he would discuss this matter with Armstrong. Upon taking the witness stand, the prosecutor asked Armstrong where she worked. She said "I work at WISH." The prosecutor then asked what WISH does in Ketchikan, to which she responded "We're a 24 hour shelter for victims." Wyatt's attorney immediately objected. Judge Weeks sustained the objection and gave the jury the following instruction:

> The testimony that's being offered in this case, Ladies and Gentlemen, has been allowed for the limited purpose relating to the possible state of mind of Diane Wyatt at the time that she made the statement to these people, if you find that she made the statement. You may not consider it in any fashion for the truth of the matter asserted. And it's being offered to show that she went to this organization to get help with respect to obtaining [a] divorce, as I understand it, and not for any other purpose.

3607

B 5 of 41

> To the extent that the agency does other things, that's not what this evidence is being offered for.  To the extent that Ms. Armstrong testified about the shelter, that was not what Ms. Wyatt was called about here.

Wyatt then asked the court for a mistrial, which the court denied. Wyatt appeals this ruling.

In Roth v. State, 626 P.2d 583, 585 (Alaska App. 1981), we stated:

> Whether to grant a mistrial is committed to the sound discretion of the trial court, and its decision will only be overturned where clearly erroneous.  The trial judge has the opportunity to observe the tainted evidence in the context in which it is received by the jury.  He, far better than we, can tell whether substantial prejudice has been done.

(Citations omitted.)  In Roth we also stated: "[T]he general rule [is] that 'where the trial judge withdraws improper testimony from the jury's consideration, such an instruction is presumed to cure any error which may have been committed by its introduction.'"  Id. at 585 (quoting Anderson v. State, 438 P.2d 228, 232-33 n.15 (Alaska 1968)).

In the present case, Judge Weeks' instruction to the jury made it clear that the state was not alleging that Diane Wyatt contacted the WISH program for any purpose other than "to get help with respect to obtaining [a divorce]."  We believe that with this clarification, Judge Weeks did not abuse his discretion in concluding that it was not necessary to grant a mistrial to prevent Wyatt from being unfairly prejudiced.

Wyatt next contends that Judge Weeks erred in admitting the testimony of Vicki Armstrong as we have previously stated.

- 6 -

3607

Armstrong testified that on October 21, 1992, when she was working
at WISH, a woman called and identified herself as the victim, Diane
Wyatt.  The woman said she wanted information on divorce, and made
an appointment to visit WISH two days later.  The woman also told
Armstrong that "there was a possible lethal situation when she told
her husband about [the divorce]."  Armstrong asked her if she was
going to be safe until the appointment, and the woman said "if she
kept her mouth shut she would be."  Wyatt had objected earlier, in
anticipation of this testimony, claiming that it was inadmissible
hearsay.  Judge Weeks ruled that the testimony was admissible to
show Diane's state of mind, a specific hearsay exception under
Evidence Rule 803(3).

> Evidence Rule 803(3) allows admission of:
>
> [a] statement of the declarant's then existing
> state of mind, emotion, sensation, or physical
> condition (such as intent, plan, motive,
> design, mental feeling, pain, and bodily
> health) offered to prove his present condition
> or future action, but not including a
> statement of memory or belief to prove the
> fact remembered or believed[.]

Before a declarant's statement is admissible to show state of mind,
the evidence must be directly relevant to some genuinely disputed
issue.  <u>Linton v. State</u>, 880 P.2d 123, 130 (Alaska App. 1994),
<u>cert. denied</u>, 116 S.Ct. 1693 (1996). Moreover, although evidence of
the declarant's state of mind is admissible to prove the
declarant's subsequent actions, it is not admissible to prove
someone else's actions.  <u>See</u> Commentary to Alaska Evidence Rule
803(3), fourth paragraph.  Thus, Diane's statement about "a
possible lethal situation" was not admissible to prove that Wyatt

- 7 -                                                      3607

B 7 of 41

likely did something or planned to do something to justify Diane's fear.  Id.

In the instant case, Armstrong's testimony concerning Diane Wyatt's contact with her was relevant to show Diane's state of mind: that she had made up her mind to obtain a divorce from her husband and was taking steps to obtain a divorce.  This testimony was relevant to support the state's theory of Ronald Wyatt's motive for murder.[1]

The state theorized that Wyatt was a domineering, jealous, controlling husband who emotionally abused his wife, and when he learned that she wanted a divorce, he decided that if he could not "win her back," he would rather kill her than lose control of her.  Second, the state posited, Wyatt wanted access to Diane's money.  More specifically, Wyatt feared that if he and Diane got divorced, he would get none of her money and the divorce would ruin him financially.  Therefore, when he learned she was pursuing a divorce, he killed her to get her money.

However, it appears to us that it was improper for the court to admit the statement that "there was a possible lethal situation when she told her husband about [the divorce]."  The jury might have used this statement for a forbidden hearsay purpose: to conclude that because Diane Wyatt feared possible violence from her husband when she told him of her intent to divorce him, that he had reacted violently.  Although we find that the trial court erred in

---

[1] The same analysis leads us to conclude that there was no reversible error in statements which Diane made to her sister, Susan Vik.

admitting this statement, we believe that the admission of this statement was harmless. In the context of this lengthy trial and the extensive evidence against Wyatt, we are convinced that the admission of this statement did not appreciably affect the jury's verdict. Love v. State, 457 P.2d 622 (Alaska 1969).

Wyatt contends that Diane's statement to Armstrong lacked reliability and therefore violated his right to confrontation. Statements which satisfy an exception to the hearsay rule must still comport with the accused's right to confrontation. Linton, 880 P.2d at 129. Under the confrontation clause, a hearsay statement is admissible against the accused "only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." Id. (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)). This court has ruled that the state-of-mind exception to the hearsay rule is traditionally accepted and firmly rooted. State v. McDonald, 872 P.2d 627, 643 (Alaska App. 1994). We adhere to that decision, and conclude that admission of Diane Wyatt's statements to Armstrong did not violate Wyatt's rights under the confrontation clauses of the United States and Alaska Constitutions.[2]

_____

[2] Wyatt contends that there was insufficient evidence that the telephone call which Armstrong received was actually made by Diane Wyatt. However, there was sufficient evidence to support a reasonable conclusion that Diane was the caller. Judge Weeks therefore correctly determined that the evidence was conditionally admissible. A.R.E. 104(b). In admitting the evidence, Judge Weeks made it clear that it was up to the jury to decide if Diane Wyatt actually made the call. He instructed the jury to consider Diane's
(continued...)

B 9 of 41

Wyatt next contends that Judge Weeks erred in allowing testimony concerning Wyatt's threats to burn Diane Wyatt's house.[3] In 1990, two years before Diane's death, Diane and Wyatt went to Mexico on a vacation with their friends Amber and Kenton Mathewson. Amber Mathewson testified that Wyatt told Diane that she was not behaving, and that if she did not behave better, he would return to Ketchikan the next day, and if she did not go with him she would have nothing to go home to because he would destroy her house. Bruce Hinsdale, the marriage counselor the Wyatts visited during the first week of October, 1992, testified that Diane said that Wyatt had threatened to "torch the house" and that this was the "final straw" persuading her to seek a divorce. Wyatt argues that this testimony was erroneously admitted because it violated Evidence Rule 404(b). In Lerchenstein v. State, 697 P.2d 312, 315-16 (Alaska App. 1985), aff'd, 726 P.2d 546 (Alaska 1986), this court discussed a two-step analysis for judges to employ in determining the admissibility of 404(b) evidence. First, the court must determine that evidence is relevant for a purpose other than to show criminal propensity. Second, its potential for prejudice must be outweighed by its probative value. Judge Weeks applied this analysis and determined that the evidence was admissible. We

---

[2](...continued)
statements to Armstrong to show her state of mind "if you find that she made the statement." It appears that Judge Weeks did not err in determining that the evidence was sufficiently corroborated to be admissible and that he properly left the question of whether Diane Wyatt made the telephone call to the jury.

[3] Diane helped build the house and was awarded the house in her divorce from her first husband.

B 10 g 41

conclude that Judge Weeks did not abuse his discretion. The incident in question tended to illustrate the relationship between the Wyatts and to support the state's theory of Ronald Wyatt's motive to kill Diane. The state theorized that Wyatt was a very controlling person who was willing to threaten to burn down Diane's house to control her behavior. The state theorized that Wyatt, unable to control Diane's behavior with threats, killed her. Wyatt's threat to burn the house down also was relevant to provide some context for Diane's decision to seek a divorce. A.R.E. 803(3). We believe that Judge Weeks could properly determine that the evidence was admissible under Rule 404(b) to establish motive.

Wyatt contends that Judge Weeks erred in admitting statements of Diane Wyatt and various friends that Ronald Wyatt was domineering and controlling. However, we conclude that Judge Weeks could properly determine that the testimony of the friends was integral to the state's theory of why Diane's decision to seek a divorce motivated Wyatt to kill her. The friends' testimony was admissible for this purpose. 2 John H. Wigmore, Evidence §§ 394-97 (Charbourne rev. 1979). Diane's statements were inadmissible hearsay if offered to prove that Wyatt was domineering, but they were admissible to corroborate that Diane had decided to obtain a divorce. A.R.E. 803(3).[4]

---

[4] Wyatt also asserts that the conclusions of Diane's friends were inadmissible lay opinions. We conclude, however, that Judge Weeks could determine that the friends' testimony was rationally based on their perceptions and was helpful to a clear understanding of their testimony. Therefore, these witnesses' conclusions were properly admitted pursuant to Alaska Evidence Rule 701.

B 11 g 41

Wyatt next contends that Judge Weeks erred in admitting the testimony of Terry Leberman, a co-worker of Wyatt's. Around the end of the summer of 1992, Wyatt told Leberman about the problems he and Diane were having as a married couple. Wyatt told him he thought a divorce would disrupt his lifestyle. Leberman testified that Wyatt later became very angry and harsh, and as a result Leberman became "very concerned for Diane's safety." Leberman went to Alaska Airlines, where Diane worked, intending to warn her. When he saw her at the Alaska Airlines counter, he noticed she was quite upset, so he turned to leave, thinking it would be better to approach her at some other time. As he was leaving, he saw Wyatt sitting in the corner of the Alaska Airlines office.

Wyatt objected to Leberman's testimony, arguing that his statement that he had become concerned for Diane's safety amounted to speculation and personal opinion. He asked the court to instruct the jury to not consider Leberman's concerns. Judge Weeks admitted the testimony, concluding that this was the kind of opinion evidence a lay person could give and that the jury could understand. Evidence Rule 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Judge Weeks could properly determine that Leberman's testimony was admissible under the rule. Leberman was familiar with Wyatt. He

B 12 of 41

heard Wyatt talk about his divorce.     At some point Leberman observed that Wyatt was sufficiently upset that he concluded that he should warn Diane Wyatt.  This testimony was admissible to describe Wyatt's reactions and behavior toward Diane shortly before the homicide.   Leberman's statements that he was concerned about Diane's safety and thought he should warn her illustrate his perception of how angry and upset he thought Ronald Wyatt was at this time.   We believe that this evidence was opinion testimony that was rationally based on Leberman's perceptions, was helpful to a clear understanding of his testimony, and therefore was properly admissible.

Susan Vik also testified that she became concerned about Diane's welfare after Wyatt learned of her intentions to divorce him.   Wyatt argues on appeal that this was "highly prejudicial." However, Wyatt does not challenge Vik's testimony about many of the actions she took when she learned that Diane had disappeared shortly after indicating her desire to divorce Wyatt.   Vik testified that she called WISH to see if Diane made it to her appointment, called Diane's house looking for her, had Diane's daughter call Diane's house, drove to Diane's house and asked Wyatt where Diane was, drove around the area near Diane's house looking for her car, left messages in the car Diane was driving and on her answering machine, asked Bob Luse to drive around in search of Diane, and more.  It seems obvious from Vik's actions that she was concerned about Diane's welfare, and that her statement to this effect was neither surprising nor prejudicial.  We conclude that

*3607*

B 13 q 41

Judge Weeks did not abuse his discretion by admitting this testimony.

Wyatt next contends that Judge Weeks erred in failing to suppress as evidence a bank signature card. Prior to trial the state theorized that Wyatt had forged Diane Wyatt's signature on the Key Bank signature card.[5] The prosecutor issued a subpoena to Key Bank of Alaska for the signature card. The subpoena required the bank to turn the card over to the prosecutor's office instead of to the court. Wyatt moved to suppress, contending that the prosecutor acted unlawfully in having the bank card returned to the district attorney's office rather than the court. Judge Weeks ruled that this was a violation of Criminal Rule 17(c). He declined to suppress the evidence, however, finding that "the purposes of the rule were satisfied. [There was] timely discovery to the defense of the matters subpoenaed and the state would have been entitled to the information if the defense had objected to the subpoena as there was probable cause that would satisfy the requirements of a search warrant." Judge Weeks ordered the prosecutor's office to pay $300 as a sanction. Wyatt contends that this evidence should have been suppressed. We believe that Judge Weeks properly concluded that suppression of the evidence was not a proper remedy for the state's misconduct. In the first place, it appears that the account in question was Diane Wyatt's account. It

---

[5] The FBI expert who testified at trial concluded that Diane did not prepare the signature on the card. He also testified that he could not conclude that Wyatt prepared the signature, but also that he could not eliminate Wyatt as a possible writer.

6 14 of 41

does not appear that Ronald Wyatt had any standing to contend that his rights were violated by the state's conduct in obtaining Diane Wyatt's signature card.  <u>See generally</u> <u>Waring v. State</u>, 670 P.2d 357, 360-63 (Alaska 1983); <u>Samson v. State</u>, 919 P.2d 171, 173-75 (Alaska App. 1996) (Mannheimer, J., concurring).  Even if Wyatt had standing, Judge Weeks could properly determine that Wyatt was not prejudiced by the state's action and that the state's conduct was not conduct warranting suppression.  <u>See</u> <u>Harker v. State</u>, 663 P.2d 932, 935 (Alaska 1983) (stating that in determining whether illegally obtained evidence should be suppressed, the supreme court has "balanced the purpose behind excluding illegally obtained evidence with the interest in admitting reliable evidence").

Wyatt next contends that Judge Weeks erred in giving an instruction to the jury concerning the investigation by the Alaska State Troopers.  One of the troopers who investigated Diane's death was Trooper Craig MacDonald.  At some point after Diane's death, MacDonald became involved in a romantic relationship with her daughter, Gretchen Sivertsen.  The state proposed a jury instruction regarding the relevance of this relationship. Ultimately, Judge Weeks instructed the jury as follows:

> The court has admitted evidence about the relationship between Trooper MacDonald and Gretchen Sivertsen.  It was admitted only for your consideration as to whether or how that relationship affected the testimony of either Trooper MacDonald or Gretchen Sivertsen.
>
> Trooper MacDonald may be currently subject to an investigation into his behavior with Ms. Sivertsen.  To the extent such an investigation might affect his testimony you may consider it.

- 15 -

3607

B 15 of 41

The conduct of Trooper MacDonald or the existence of an investigation by the Alaska State Troopers may be an issue for you to consider. However, Trooper MacDonald or the Alaska State Troopers are not on trial in this case. You are to consider Trooper MacDonald's conduct and the existence of the Alaska State Trooper investigation of Trooper MacDonald only to the extent that it affects whether there is proof beyond a reasonable doubt that the defendant committed the offenses charged in the indictment.

Wyatt objected to the instruction, and now argues that the sentence stating that neither MacDonald nor the troopers are on trial was an improper comment on the evidence by the trial court. However, Alaska Evidence Rule 105 provides as follows:

When evidence which is admissible as to one party for one purpose but not admissible as to another party or for another purpose is admitted, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

We believe that the instruction which Judge Weeks gave is consistent with Evidence Rule 105 and was not an improper comment on the evidence.

Wyatt next contends that Judge Weeks erred in restricting his cross-examination of Trooper Jeffery Hall and in instructing the jury on how to interpret Hall's testimony. During the investigation, troopers interviewed Lloyd Hawn, a security guard who worked the swing shift at the Ketchikan Pulp Mill. Hahn told the troopers that on October 22 he found an unattended Isuzu Trooper in the log sorting yard around 10:30 p.m. He had the license plate number checked and discovered the car was registered to Ronald or Diane Wyatt. As Hawn was checking on the vehicle, a

- 16 -

B 16 of 41

man appeared.   He was muddy and wet, and apologized for being on the property.   He said that he suddenly had to go to the bathroom as a result of the medication he had taken.   Hawn was unable to identify the man.

Troopers Jeffrey Hall and Craig MacDonald participated in the investigation of Diane's death.   During cross-examination of Hall, Wyatt's attorney attempted to elicit information concerning the relationship between Hawn and Trooper MacDonald.   Wyatt's theory was that Hawn was a trooper "groupie" who would slant his testimony in favor of the state in order to gain McDonald's favor. When Wyatt's attorney asked Trooper Hall if he knew if Hawn was a close friend of Trooper MacDonald, the prosecutor objected on grounds of relevance.   Judge Weeks sustained the objection, but the following transpired between Wyatt's attorney, Hall, and the court.

Def. Atty:     Do you know if they both belong to
               the same type of club and . . . if
               Mr. Hawn spends time riding around
               with Trooper MacDonald?

        . . . .

Hall:          I have no knowledge of Mr. Hawn's
               personal     activities,    of    his
               friendships,    or    of    Trooper
               MacDonald's activities, and Trooper
               MacDonald's friendships.

Def. Atty:     Have you made any effort to find
               that out?

Hall:          I try not to pry into Trooper
               MacDonald's or Mr. Hawn's private
               lives.

Def. Atty:     Well you know the nature of Trooper
               MacDonald's activities in this case,
               don't you?

- 17 -

3607

B 17 of 41

| | |
|---|---|
| Hall: | I know what Trooper MacDonald did, yes. |
| Def. Atty: | And after finding that out in terms of the statements he was making to Gretchen [Sivertsen — Diane's daughter], did you ever make any effort to try to find out the nature of the relationship between Mr. Hawn and Trooper MacDonald? Specifically as to whether Mr. Hawn was in the practice of riding around with Trooper MacDonald and whether they belonged to the same type of social club in Ketchikan. Did you make the effort to find that out or not? |
| Court: | I'm going to sustain the objection as to relevance. [To the jury] Ladies and gentlemen, the Court has allowed evidence of Trooper MacDonald's relationship with Ms. [Sivertsen] and you may consider that to the extent that you feel that it affects the testimony of any witnesses. And that's all that it's related to. And the thing for you to consider is whether there's evidence in this case of suspicion to prove whether Mr. Wyatt committed these offenses or did not. To the extent that the trooper investigation produces that evidence, then such is relevant. The conduct of Trooper MacDonald or the police in general is not relevant to your consideration, other than whether or not there is sufficient evidence before the Court for you to decide whether or not Mr. Wyatt's guilty or not. You may proceed [defense attorney]. |
| Def. Atty: | I need a moment, please. |
| | (Pause) |
| Def. Atty: | Has Mr. Hawn ever ridden around in your vehicle or not? |
| Hall: | No, Mr. Hawn has never ridden in my vehicle. |

- 18 -

3607

B - 18 of 41

Def. Atty:      Are you aware of Mr. Hawn riding with any troopers or be[ing] a friend of any troopers?

Hall:           As I stated, I have no knowledge of Mr. Hawn's personal friendships or his interaction with other members of my department.

The preceding cross-examination of Trooper Hall occurred on October 14, 1993. Wyatt's attorney did not object to the court's instruction to the jury until the next day, October 15. He asserted that the instruction was inaccurate and needed to be corrected. On October 18, 1993, Wyatt's attorney proposed a curative instruction. Judge Weeks denied his motion to give a curative instruction, reasoning that the jury could interpret the instruction he gave in its context, and that he read the jury the reasonable doubt instruction earlier in the trial, and would read them the reasonable doubt instruction again at the end of the trial.

Wyatt argues that Judge Weeks' statement to the jury "and the thing for you to consider is whether there's evidence in this case of suspicion to prove whether Mr. Wyatt committed these offenses or did not" could be interpreted to mean that Wyatt's guilt could be proven by suspicion rather than proof beyond a reasonable doubt. The state provides an alternative interpretation -- that throughout trial, Wyatt developed a defense theory which included a claim that the troopers investigated Wyatt, but failed to investigate other potential suspects, and that evidence may have been manufactured. In this context, the state contends, Judge Weeks' instruction to the jury was appropriate, because it told the

- 19 -

3607

B 19 of 41

jury that any potential relationship between Trooper MacDonald and Sivertsen was relevant only to how it would affect their testimony, and whether or not the troopers were rightfully suspicious of Wyatt such that an investigation of him was justified.

We conclude that Judge Weeks' comments to the jury do not constitute reversible error. Judge Weeks thoroughly instructed the jury that it was only to convict Wyatt if it found the state had proven its case beyond a reasonable doubt. We are confident that this is the standard which the jury applied.

Wyatt also contends that Judge Weeks erred when he sustained the state's objection to his questioning of Trooper Hall on the basis of relevance. However, it appears that Wyatt's cross-examination of Trooper Hall was not restricted. The defense attorney's question to Trooper Hall was whether he had made any effort to find out what the relationship was between Trooper McDonald and Hawn. Trooper Hall's answers made it clear that he had not conducted any such investigation and had no such knowledge. Trooper Hall answered the defense attorney's inquiry.

Wyatt next contends that Judge Weeks committed plain error by failing to instruct the jury on lesser included offenses of murder in the first degree. Prior to jury deliberation, both the prosecution and defense submitted proposed jury instructions to the court. Neither party requested instructions on lesser degrees of homicide. Neither party objected to the omission of a lesser-included instruction.

Alaska Criminal Rule 30(b) states in relevant part:

B 20 of 41

At the Requested Instructions at Objections or other time as the court reasonably directs, any party may file written requests that the court give the jury specific instructions. . . . No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objections.

The Alaska Supreme Court stated that "[t]he main purpose of the rule is to require errors to be drawn to the attention of the trial court in time for their correction so as to avoid the inconvenience and expense of a new trial. Another reason is to obviate the temptation to save defenses for the purpose of obtaining a new trial on appeal." Dimmick v. State, 449 P.2d 774, 776 (Alaska 1969) (citations omitted).

Following his conviction, Wyatt moved for a new trial based in part on his contention that the trial court was required, sua sponte, to instruct the jury on any lesser included offenses. Judge Weeks rejected Wyatt's motion. In so doing, Judge Weeks pointed out that Wyatt had consistently maintained that he did not kill Diane Wyatt or have anything to do with her death. He concluded:

> There was not any evidence supporting any lesser included. It is impermissible now for this court to grant a motion for retrial based upon a deliberate stance and trial tactic not to request lesser included instructions. As pointed out by the state to have done so would have been inconsistent with the defense position that Mr. Wyatt was and is innocent of the charges [for] which he had been brought to trial for and eventually convicted of.

(Footnote omitted.) Judge Weeks' findings are supported by the record. We find no plain error. Clemans v. State, 680 P.2d 1179,

- 21 -

3607

B 21.3 41

1186 (Alaska App. 1984); see also Hansen v. State, 845 P.2d 449, 454 n.3 (Alaska App. 1993).

      Wyatt next contends that Judge Weeks abused his discretion by allowing the state to present DNA evidence against him at trial. The troopers found two droplets of blood on cardboard boxes in the basement of the Wyatts' home during the investigation of this case. Leanne Strickland from the Alaska State Crime Laboratory testified that she performed a DNA test known as PCR HLA DQ Alpha on this blood and concluded that the blood was inconsistent with Ronald Wyatt's DNA, but was consistent with Diane Wyatt's DNA. She testified that the DNA configuration in the blood found on the boxes would be found in approximately ten percent of the population. Prior to trial, Wyatt challenged the admission of the results of the DNA testing, claiming that DNA testing did not meet the Frye[6] standard for admissibility of scientific evidence. Judge Weeks held a Frye hearing and ruled that the PCR HLA DQ Alpha testing was generally accepted in the scientific community and satisfied the Frye test. Wyatt appeals that ruling. In Harmon v. State, 908 P.2d 434 (Alaska App. 1995), we found that PCR HLA DQ Alpha analyses are "routinely performed and are generally accepted in the relevant scientific community[.]" Id. at 440. Harmon disposes of Wyatt's claim that Judge Weeks erred in finding that the PCR HLA DQ Alpha test is generally accepted in the scientific community and satisfies the Frye test.

---

[6] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

3607

B 22 of 41

Wyatt also contends that Judge Weeks erred in allowing the state to present the statistical evidence that ten percent of the population would have DNA consistent with the DNA the troopers found on the cardboard boxes. In Harmon we observed that "a statistical analysis which understated the probability of a match between [the defendant's] DNA and the DNA found at the crime scene (thereby overstating the significance of the match) could be unduly prejudicial." Id. at 442. We concluded that, to be admissible, a statistical analysis should conservatively estimate the probability of a match. Id. In Wyatt's case, Leanne Strickland testified to the statistical analysis which she employed. She relied on the same data bases which, in Harmon, we found to be generally accepted within the relevant scientific community of human population geneticists. Id. In allowing admission of the statistical analysis, Judge Weeks took steps to ensure that the evidence which the state presented at trial conservatively estimated the probability of a DNA match. We accordingly conclude that Judge Weeks did not err in allowing the state to present the statistical analysis.

Wyatt next contends that his sentence of ninety-nine years for murder is excessive. However, this court and the supreme court have consistently found sentences of ninety-nine years of imprisonment for murder in the first degree not clearly mistaken. Thompson v. State, 768 P.2d 127, 133 (Alaska App. 1989); Riley v. State, 720 P.2d 951, 952 (Alaska App. 1986). In the present case, Judge Weeks found that Wyatt committed "an intentional, deliberate,

B 23 q 41

and premeditated crime." He found that Wyatt wanted Diane's money, intended to obtain the money, and saw the divorce as an obstacle to getting the money. He concluded that Wyatt was a worst offender who was dangerous to the public. Wyatt points out that he was forty-nine years of age at the time of the crime, had no prior criminal record, and had been a productive member of society. However, Judge Weeks' findings, which are supported by the record, fully justify the finding that this was a premeditated offense by a dangerous offender justifying imposition of the ninety-nine year sentence.

Wyatt also contends that Judge Weeks erred in imposing the five-year tampering with evidence sentences consecutively to the ninety-nine years of imprisonment. Wyatt relies on this court's decision in Thompson v. State, 768 P.2d 127, 133-34 (Alaska App. 1989). In Thompson we stated:

> In order to justify imposing a sentence consecutive to the ninety-nine-year murder sentence, the trial court would have to find that confinement of the defendant for the aggregate period of the consecutive sentence was necessary to protect the public. We do not believe that a sentence in excess of ninety-nine years can be justified except where the trial court finds that in order to protect the public the defendant must spend the rest of his life in prison without any possibility of parole. Where the record did not support this finding, we have previously not approved sentences in excess of the ninety-nine-year maximum term for murder.

Id. at 133-34 (citing Mutschler v. State, 560 P.2d 377 (Alaska 1977) (footnote and citations omitted)).

B 24 q-41

Judge Weeks found that Wyatt was an intelligent, determined person who was likely to commit similar offenses if he were not confined in prison for the entire term which he imposed. In context, it is clear that Judge Weeks' findings were sufficient to justify the imposition of consecutive sentences under Thompson and Mutschler. We conclude that the sentence was not clearly mistaken.

The convictions and sentence are AFFIRMED.

3607

B 25 of 41

*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878.*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RONALD F. WYATT,<br><br>    Petitioner,<br><br>v.<br><br>STATE OF ALASKA,<br><br>    Respondent.<br>_____ | Supreme Court No. S-8252<br>Court of Appeals No. A-5291<br><br>Superior Court No.<br>1JU-S93-1416 CR<br><br>O P I N I O N<br><br>[No. 5128 - May 28, 1999] |

NOTICE TO COUNSEL: This opinion will be released to the press and public at 12:30 p.m. (Anch. time) on the date indicated. This copy is provided to counsel or record in advance. Prior to the release time, please do not inform persons other than your clients in this case of the outcome.

Clerk of the Appellate Courts

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Larry R. Weeks, Judge.

Appearances: Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Petitioner. Kenneth M. Rosenstein, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before: Matthews, Chief Justice, Eastaugh, and Fabe, Justices. [Bryner, Justice, not participating.]

FABE, Justice.

## I.    INTRODUCTION

A jury convicted Ronald Wyatt of murdering his wife, Diane. At trial, a women's shelter employee testified that Diane called the shelter the day before her death and stated that she

wanted to divorce Ronald. Diane also told the shelter employee that if Ronald were to learn of her plan to divorce him, there would be "a possible lethal situation." The superior court admitted this statement at trial over defense counsel's objection. The court of appeals concluded that although the statement did not fall within the Alaska Evidence Rule 803(3) hearsay exception for state of mind, the error was harmless. Ronald petitioned for hearing, arguing that such a hearsay statement implicated his right to confrontation and that the error must be "harmless beyond a reasonable doubt."

We agree that if the court of appeals had been correct in its determination that the statement did not qualify for the state-of-mind exception, it should have applied the "harmless beyond a reasonable doubt" standard rather than the "harmless error" standard. But we conclude that the statement does fall within the state-of-mind exception and that the court of appeals appropriately reviewed admission of the statement under the "harmless error" standard. We therefore affirm.

## II.  FACTS AND PROCEEDINGS

Ronald Wyatt and his wife Diane lived in Ketchikan in Diane's home from a previous marriage. The State presented evidence that Diane had gradually become unhappy during her marriage of seven years to Ronald. Witnesses testified that her husband made consistent efforts to intimidate and dominate Diane. For example, on vacation in Mexico in 1990, Ronald threatened that

5128

if she did not "behave," they were going to leave and that if she did not leave with him, he would destroy her home.

At trial, the State introduced two alternative theories of Ronald's motive to kill Diane.  First, it contended that Ronald was a domineering, controlling husband who, when he learned that Diane planned to divorce him, decided he would rather kill her than lose her.  Second, the State argued that Ronald was motivated to kill Diane because he would not receive any of Diane's money if they divorced.

To bolster both theories, the State presented evidence to establish the seriousness of Diane's intent to obtain a divorce despite her concerns about Ronald's potential reaction.  In a meeting with a marriage counselor in early October 1992, Diane expressed her desire for a divorce, stating that the "final straw" was when Ronald had threatened to "torch the house."  On October 21 an employee of Women in Safe Homes (WISH) received a phone call from Diane, requesting information about divorce and making an appointment to discuss her situation.  During this phone conversation, Diane stated that "there was a possible lethal situation when she told her husband about it."  The WISH employee testified:  "[A]fter she said that statement, I -- I said, well, are -- are you going to be safe, you know, until you come in on Friday, and she said, if she kept her mouth shut she would be."  Diane had previously expressed similar concerns to her sister and daughter about Ronald's reaction to her plan to divorce him.

-3-

5128

B 28 of 41

In support of its theory that Ronald was motivated by his fear of losing Diane's money, the State offered evidence of recent financial transactions in the Wyatt accounts. The personal representative of Diane's estate testified that around the first of October, a joint checking account for the Wyatts was first opened. Also during the month of October, about $53,000 was transferred from Diane's personal accounts in a South Dakota bank into the joint account and a personal account of Ronald Wyatt. Ronald's co-worker testified that he saw a draft of a letter authorizing such a transfer on Ronald's computer. The State presented testimony that Diane's signatures on the actual letter authorizing the transfer and the signature card opening the joint account were forgeries.

The State also presented a strong case of circumstantial evidence. On October 22 Diane disappeared. Earlier that day, Diane informed her sister during lunch that she had made an appointment at WISH for the next day to discuss the divorce. Diane left lunch to meet a co-worker, but she never arrived at that meeting. One of Ronald's co-workers testified that Ronald left work before noon on October 22 and returned about 4:00 p.m. Sometime in the afternoon, two neighbors saw the Wyatts' Isuzu Trooper speeding up the driveway to the Wyatt home. Neighbors also saw Ronald burning cardboard boxes on the beach in front of the Wyatt home in the early evening. In the basement, police investigators found cardboard boxes neatly stacked on one side and strewn in disarray on the other and discovered traces of blood. At

-4-                                                                  5128

approximately 10:30 p.m. on October 22, a security guard at the Ketchikan Pulp Mill discovered the Wyatts' Isuzu Trooper near the gate to the log sorting yard at Ward Cove. As the guard checked the vehicle registration information, a man who was muddy from the waist down, acting nervous, and breathing heavily, approached the vehicle.

Five days later, a search dog and its handler discovered Diane's body wrapped in a tarp and weighted with anchors and chains in the water near the log sorting yard in Ward Cove. Approximately one month before Diane's death, Ronald stated in a discussion of a different murder case in Ketchikan with his co-workers that if he wanted to kill his wife, he would dispose of the body by wrapping it in a tarp, tying it securely, and weighting it down so it would never be found.

At trial, the superior court admitted the testimony of the WISH employee that she had talked to Diane on the phone about divorce, and she testified that Diane had stated "there was a possible lethal situation when she told her husband about [the divorce]." Ronald objected to the admissibility of these statements as hearsay during the trial, contending that the two limited purposes for which the statement was relevant -- either to prove Diane planned to get a divorce or to prove that Diane had an appointment at WISH -- had already been established. Ronald also argued that admitting the statement would have extreme prejudicial impact. The superior court admitted the testimony under the state-of-mind exception to the hearsay rule but provided a limiting

-5-                                                                                   5128

B 30 of 41

instruction to the jury, telling them they could not consider the statement to prove the truth of the matter asserted.   The jury convicted Ronald of all charges.

Ronald appealed.   He claimed that Diane's statement that a "lethal situation" would arise when she informed Ronald of her plans to divorce him constituted inadmissible hearsay and that its admission violated his right to confrontation.   The court of appeals apparently determined that the statement was hearsay testimony and did not fall within the state-of-mind exception:

> [I]t appears to us that it was improper for the court to admit the statement that "there was a possible lethal situation when she told her husband about [the divorce]." The jury might have used this statement for a forbidden hearsay purpose: to conclude that because Diane Wyatt feared possible violence from her husband when she told him of her intent to divorce him, that he had reacted violently.

But the court of appeals concluded that the trial court's error in admitting the statement was harmless and affirmed the conviction. It is somewhat unclear whether the court of appeals relied upon the state-of-mind exception in rejecting the confrontation claim.[1]

Ronald then petitioned for a hearing in this court, asserting among other claims that the court of appeals applied the wrong harmless error standard in addressing the "lethal situation" statement.   We granted the petition to consider this issue.

---

[1]    The court of appeals stated: "[T]he state-of-mind exception to the hearsay rule is traditionally accepted and firmly rooted. . . . [A]dmission of Diane Wyatt's statements to [the WISH employee] did not violate Wyatt's rights under the confrontation clauses . . . ."

B 31 of 41

## III. <u>DISCUSSION</u>

### A.  <u>Standard of Review</u>

We review a trial court's ruling on the admissibility of hearsay testimony for an abuse of discretion.[2] We reverse only if upon review of the record as a whole, we are left with a definite and firm conviction that the trial court erred in its ruling.[3]

If the trial court erred in its ruling, we then determine whether the error was harmless. A non-constitutional evidentiary error is harmless if the error did not appreciably affect the jury's verdict.[4] If the trial court commits constitutional error at trial, we must determine whether the error was harmless beyond a reasonable doubt.[5] The burden of proof under the "harmless beyond a reasonable doubt" standard lies with the State.[6]

### B.  <u>Admission of the "Lethal Situation" Statement Was Harmless Error.</u>

#### 1.  <u>The court of appeals's opinion does not clearly state whether the statement falls within the state-of-mind exception.</u>

The parties disagree on whether the "lethal situation" statement qualified as a hearsay exception. The court of appeals concluded that the trial court erred in admitting Diane's statement

---

[2]    See <u>Colt Indus. Operating Corp., Quincy Compressor Div. v. Frank W. Murphy Mfr., Inc.</u>, 822 P.2d 925, 932 (Alaska 1991); <u>Ryan v. State</u>, 899 P.2d 1371, 1379 (Alaska App. 1995).

[3]    See <u>Colt Indus.</u>, 822 P.2d at 932.

[4]    See <u>Love v. State</u>, 457 P.2d 622, 631-32 (Alaska 1969).

[5]    See <u>Wamser v. State</u>, 652 P.2d 98, 103 (Alaska 1982).

[6]    See <u>id.</u>

-7-                                                                5128

B 32 of 41

that she faced a potentially "lethal situation" if Ronald learned
of her plan to divorce him.  But it is unclear from the court of
appeals's opinion whether it considered the "lethal situation"
statement to fall within the state-of-mind exception to the hearsay
rule.  Ronald contends that the court of appeals "correctly
concluded that [the 'lethal situation' statement] did not fall
within the state of mind exception to the rule against hearsay." In
contrast, the State argues that the court of appeals "recognized"
that the WISH employee's statement fell within the hearsay
exception in Alaska Evidence Rule 803(3) but concluded that the
statement should not have been admitted under Alaska Evidence Rule
403 because its potential for unfair prejudice outweighed its
probative value.[7]

  In order to apply the proper harmless error standard to
an error in admitting an out-of-court statement, a reviewing court
must first clearly determine whether the statement falls within an
established exception to the hearsay rule.  If Diane's statement
falls within the state-of-mind exception to the hearsay rule but
was improperly admitted because its prejudicial effect outweighed
its probative value, the court of appeals appropriately applied the
harmless error standard.  But if the statement was inadmissible

---

[7] Alaska Evidence Rule 403 provides:

  Although relevant, evidence may be excluded if
its probative value is outweighed by the
danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by
considerations of undue delay, waste of time,
or needless presentation of cumulative
evidence.

5128

633 of 41

hearsay that did not fall within any exception, the admission of the statement implicates Ronald's right of confrontation.  In that case, the court of appeals should have determined whether the error in admitting the statement was harmless beyond a reasonable doubt.

Despite the State's argument that Rule 403 was the basis for the court of appeals's holding, the court of appeals apparently concluded that the statement did not fall within the state-of-mind exception.  While the trial court specifically addressed Rule 403 concerns, the court of appeals never discussed Rule 403, nor did it review the trial court's balancing of the probative value of the statement and its potential unfair prejudice.  Instead, the court of appeals focused on the purpose of the "lethal situation" statement, concluding that "Diane's statement about 'a possible lethal situation' was not admissible to prove that [Ronald] likely did something . . . to justify Diane's fear."  It determined that while the statement was "relevant to show Diane's state of mind . . . [and] to support the state's theory of Ronald Wyatt's motive for murder," it was improper to admit the statement because "[t]he jury might have used [it] for a forbidden hearsay purpose: to conclude that because Diane Wyatt [had] feared possible violence from her husband . . . he had reacted violently."  This language suggests consideration of the scope of the state-of-mind exception, rather than analysis of whether possible prejudice outweighed probative value.

Because the court of appeals does not appear to have used Rule 403 in any part of its analysis, we agree with Ronald that the

B 34 of 41

court of appeals concluded that the "lethal situation" statement did not fall within the state-of-mind exception. We therefore examine the merits of that determination.

> ### 2. The "lethal situation" statement falls within the "state-of-mind" hearsay exception.

Alaska Evidence Rule 803(3) allows admission of "[a] statement of the declarant's then existing state of mind . . . offered to prove [her] present condition or future action." Evidence of a murder victim's fear of the accused is inadmissible "if its <u>only</u> relevance is as circumstantial evidence of the accused's conduct, that is, if its probative value depends on the impermissible inference that, because the victim feared the accused, the accused likely did something or planned to do something to justify the fear."[8] To admit such evidence, the State must establish that the evidence is "directly relevant to some genuinely disputed issue."[9]

We must thus determine whether the superior court allowed the statement for a permissible purpose: to prove Diane's state of mind or plan for future action. The court of appeals recognized that the WISH employee's testimony was "relevant to show . . . that [Diane] had made up her mind to obtain a divorce from her husband and was taking steps to obtain a divorce," thus supporting the State's theory of motive for murder. But it apparently concluded

---

[8]    <u>Linton v. State</u>, 880 P.2d 123, 130 (Alaska App. 1994) (emphasis added), <u>aff'd on reh'g</u>, 901 P.2d 439 (Alaska App. 1995).

[9]    <u>Id.</u>

B 35 of 41

that Diane's intent to divorce Ronald was not a disputed issue at trial. We disagree.

Ronald argues that Diane's fear of her husband was not relevant to any disputed issue at trial because everyone agreed that Diane was determined to seek a divorce from Ronald. But Ronald's closing argument belies his current assertion that he never disputed Diane's intent to divorce him and the seriousness of her purpose:

> Now we just talked about suspicion and conjecture. There is no question but that there was some discussions between Ron Wyatt and Diane Wyatt about the state of their marriage, and there['s] no question -- and it's not that uncommon that they've been married for seven years or nine year[s], that there was serious problems ongoing. But no -- no divorce papers, no dissolution papers. Basically, -- and -- and it may be -- well be true that she was going to divorce him. And sure it's suspicious if someone's going to divorce someone and they get killed. But -- but that's not proof. . . . There's some divorce talk. What marriage . . . that goes on for seven to nine years doesn't have some divorce talk in it. What person that truly loves another person doesn't hope for a reconciliation.

Thus, Ronald disputed at trial that Diane seriously intended to divorce him.

To prove either of the State's theories of motive for murder -- that Ronald feared losing control of Diane or Diane's money -- the State also had to convince the jury of Diane's intent to divorce Ronald. As the State argues, Diane's fearfulness of Ronald's reaction served as "a tangible measure both of how serious she was about obtaining a divorce and of the likely imminence of

-11-                                                                     5128

B 36 of 41

her action." Ronald undercut Diane's seriousness of purpose by asserting that the evidence of her desire for a divorce was simply idle talk where both persons may have "hope[d] for a reconciliation." Thus, evidence of Diane's determination to divorce Ronald despite any fear of a "lethal situation" demonstrated the seriousness of her purpose and intent and was therefore probative of her state of mind and plan for future action.

Accordingly, the court of appeals should have ruled that the statement was admissible unless it was used for a forbidden purpose. The court of appeals correctly stated that the testimony was not admissible "to prove that [Ronald] likely did something or planned to do something to justify Diane's fear." But that is not the purpose for which the superior court admitted the evidence. In fact, the prosecutor never mentioned the "lethal situation" statement in his over one-and-a-half-hour closing argument. He only referred to the WISH employee's testimony as proof that Diane intended to divorce Ronald and that Ronald must have forged checks drawn on Diane's account and cashed to a joint account in the last month of her life in anticipation of the divorce:

> So the day in which she makes an appointment
> with WISH, the day in which she has decided .
> . . to get out of this marriage, two weeks
> after telling a therapist in the presence of
> her husband[, "]I want out,["] . . . she's
> going to write a check to a joint account with
> her and her husband?

The prosecutor then immediately moved on to another point and never again mentioned the testimony of the WISH employee.

-12-

5128

B 37 & 41

The trial court also provided a limiting instruction to the jury on the testimony during the trial. Shortly after the prosecutor began to question the WISH employee, Ronald again objected to the testimony and asked for a cautionary instruction. The court then advised the jury:

> The testimony that's being offered in this case, Ladies and Gentlemen, has been allowed for the limited purpose relating to the possible state of mind of Diane Wyatt at the time that she made the statement to these people, if you find that she made the statement. You may not consider it in any fashion for the truth of the matter asserted. And it's being offered to show that she went to this organization to get help with respect to obtaining divorce, as I understand it, and not for any other purpose.

Thus, the State did not use this evidence to establish that Ronald was in fact planning to harm her and that he did so.[10]

Because the parties disputed the seriousness of Diane's intent to seek a divorce, the court of appeals erred in ruling that the state-of-mind exception did not cover the "lethal situation" statement.

3.  <u>Admission of the statement did not implicate Ronald's right to confrontation</u>.

Ronald contends that the admission of the "lethal situation" statement violated his right to confrontation.[11]  The

---

[10]    <u>See, e.g., id.</u> at 131 n.6 (noting that presenting evidence of wife's state of mind as proof of husband's state of mind in order to establish his likely conduct would be impermissible under Rule 803(3)).

[11]    The State argues that Ronald forfeited his right to confront Diane about her "lethal situation" statement by killing her. Several federal courts of appeals and state courts have held

(continued...)

-13-                                                    5128

admission of hearsay does not violate the Confrontation Clause as long as the evidence has "indicia of reliability."[12]  A court can infer reliability where the evidence "falls within a firmly rooted hearsay exception" or where the evidence has "particularized guarantees of trustworthiness."[13]  The state-of-mind exception is a firmly rooted hearsay exception.[14]

Because we conclude that the "lethal situation" statement falls within the state-of-mind exception and because the state-of-mind exception is a firmly rooted hearsay exception, we find that the "lethal situation" statement has sufficient indicia of reliability.  Even if the trial court failed to exclude the evidence properly under Rule 403, this error does not constitute a

---

[11](...continued) that defendants may waive their Confrontation Clause rights by their own wrongful conduct in preventing a witness from testifying at trial.  See, e.g., United States v. Smith, 792 F.2d 441, 442 (4th Cir. 1986) (admitting witness's prior statement to police in arson prosecution where defendant waived confrontation claim by procuring absence of witness); United States v. Mastrangelo, 693 F.2d 269, 272-73 (2d Cir. 1982) (admitting grand jury testimony in drug prosecution if court found on remand that the defendant killed the witness); State v. Corrigan, 691 P.2d 1311, 1314-15 (Kan. App. 1984) (admitting witness's prior testimony in arson prosecution because defendant ensured his wife would not testify).  But this waiver rule is inapplicable to the case before us.  The cases espousing this rule all involve a defendant who has intentionally acted to silence an individual in order to prevent the witness from testifying against the defendant on another criminal matter.  Thus, the "waiver-by-misconduct" rationale present in cases where a defendant silences a witness to a crime is absent from this case.

[12]   Ohio v. Roberts, 448 U.S. 56, 66 (1980) (internal quotation marks omitted).

[13]   Id.

[14]   See State v. McDonald, 872 P.2d 627, 643 (Alaska App. 1994).

-14-                                            5128

Confrontation Clause violation.[15]  Thus, the court of appeals's ruling that admission of the statement did not violate Ronald's right to confrontation was correct.

    4.   **The court of appeals applied the correct harmless error standard.**

Ronald argues that the court of appeals applied the wrong harmless error standard.  If Diane's statement did not fall within a recognized hearsay exception, as the court of appeals appears to have held, its admission violated Ronald's right of confrontation. As Ronald argues, the court of appeals should have then applied the "harmless beyond a reasonable doubt" standard.[16]  But we conclude that Diane's statement properly falls within the state-of-mind exception.  Thus, although the court of appeals used only the lesser harmless error standard, its choice did not prejudice Wyatt because that standard would have been the correct one if the court had properly evaluated Diane's statement under the state-of-mind exception.

If the superior court correctly found that the statement was an exception to the hearsay rule but erred in its evaluation of the defendant's concerns of prejudice, the court of appeals need only have applied the "harmless error" standard.  A non-constitutional error is harmless if it did not "appreciably affect

---

[15]    See _Larson v. State_, 656 P.2d 571, 575 (Alaska App. 1982) ("Alaska Rule of Evidence 403, when properly applied, does not violate a defendant's constitutional right to confront the witnesses against him and present evidence in his own behalf.").

[16]    See _Chapman v. California_, 386 U.S. 18, 24 (1967).

B 40 0f 41

the jury's verdict."[17]  We have previously held that this standard is proper even when hearsay is inadmissible under Rule 403.[18]  Here, the court of appeals evaluated the error under this standard and concluded that "[i]n the context of this lengthy trial and the extensive evidence against [Ronald], we are convinced that the admission of this statement did not appreciably affect the jury's verdict."  We agree.

As the State argues, the State presented substantial circumstantial evidence at trial indicating that Ronald murdered his wife.  Moreover, the State never seemed to focus on or emphasize the "lethal situation" statement after it was admitted.[19]  While the trial court could have sanitized the potentially inflammatory comment or excluded it from evidence, we do not believe that Diane's reference to a potentially "lethal situation" appreciably affected the jury's verdict in this case.  Thus, the error was harmless.

IV.  <u>CONCLUSION</u>

The court of appeals incorrectly held that the "lethal situation" statement did not fall within the state-of-mind exception to the hearsay rule.  But the court of appeals properly analyzed the Confrontation Clause challenge and reviewed the issue

---

[17]    <u>Love v. State</u>, 457 P.2d 622, 631-32 (Alaska 1969).

[18]    See <u>Avery v. State</u>, 514 P.2d 637, 645-46 (Alaska 1973).

[19]    <u>Cf.</u> <u>Lemon v. State</u>, 514 P.2d 1151, 1157 (Alaska 1973) (holding that admission of nontestifying accomplice's hearsay was harmful where "it was a major part of the state's case placing Lemon at the scene").

-16-                                                    5128

B 41 B 41