**EXHIBIT J**

1  a triple tragedy here with two people, Your Honor -- your --

2  ladies and gentlemen.

3      Let me talk about that for a second.  The tragedy is

4  basically this, Ronald Wyatt did and still loves, if she was

5  still alive, his wife.  He has lost her.  He's been falsely

6  accused; the second part of the tragedy.  That's what the

7  evidence is going to show.

8      And the evidence is going to show that the real killer or

9  killers is still out there, the third part of the tragedy.

10  And there's a similar tragedy with regard to the family.  And

11  that family, they hate Ron Wyatt.  That's going to be

12  apparent.  And they've lost their mother and sister.  And the

13  evidence is going to show there's been a false accusation

14  against Mr. Wyatt.  And they're going to go through the rest

15  of their live here in this courtroom hating him.  And so we've

16  got a triple tragedy for two parties here.  And we have no

17  real proof.

18      We have a lot of circumstantial evidence.  We have people

19  that are lying.   Mr. Luse is lying about the -- he says --

20  question, anyone ever point a gun at you?  No.  His wife is

21  asked, ever point a gun at anyone?  No. Just trying to sell a

22  gun at the airport.

23      You're going to see, ladies and gentlemen, at the end of

24  this case and what I told you a few moments ago is true.  No

25  real evidence, no proof beyond a reasonable doubt, a lot of

AURORA COURT REPORTING

1  Q  And how big is the room?

2  A  Oh, maybe ten by ten.

3  Q  And were there three people in the room, you and two

4     people -- Mr. and Mrs. Wyatt?

5  A  Yes.

6  Q  And how close were they sitting from each other?

7  A  Probably three or four feet from each other, maybe --

8     maybe a few feet more.

9  Q  During your consultation with Ron and Diane Wyatt, did

10    Mrs. Wyatt indicate to you her view of her husband?

11  A  Yes.

12  Q  And what was that view?

13  A  She termed him controlling and intimidating.  That's all

14    I can recall.

15  Q  Did she indicate to you her view of any desires to

16    continue the relationship or end the relationship?

17  A  She stated at the -- I don't think it was at the onset,

18    but somewhere once we got -- they began talking, she was

19    interested in a divorce.  And at the end of the session

20    made it very clear that she continued to want to pursue

21    a divorce.

22  Q  Was the defendant present during that exchange?

23  A  Yes, he was.

24  Q  Was there any discussed regarding divorce papers?

25  A  She indicated that she had obtained some -- obtained

1    divorce papers and had taken them home.  And they were in

2    home.

3  Q    Did she indicate why that was done?

4  A    It was her intent to -- to file them.

5  Q    Were there any other comments regarding issues of the

6    home?

7  A    She indicated that -- that at one point Ron Wyatt had

8    threatened to, and her word was, torch the house.

9  Q    And did she indicate her acquisition of the divorce

10    papers was a result of that or .....

11  A    Yes, there was a direct connection with that.  That was

12    the final straw that caused her to .....

13    MR. MENENDEZ:  Thank you. I have no further questions of

14  the gentleman.  Thank you, sir.

15    THE COURT:  Ladies and gentlemen, to the extent that

16  there's evidence of Mr. Wyatt saying these things or not, you

17  are not take that as evidence that he's a bad person and

18  therefore guilty of this offense.  It is to show either his

19  state of mind or Ms. Wyatt's state of mind at that time.  And

20  you're to consider it only for that purpose.

21    Mr. Weidner, you may cross examine.

22    MR. WEIDNER:  Thank you, Your Honor.

23                        **BRUCE HINSDALE**

24  testified as follows on:

25                      **CROSS EXAMINATION**

AURORA COURT REPORTING

1   A   It was friendship.  I don't know about love.

2   Q   How about Mr. Luse's friend- -- feelings for her?  Do you

3       know if he had any innocent love for her?

4       MR. MENENDEZ:  Your Honor, I ......

5   A   I can't speak for him.

6       MR. MENENDEZ:  ...... speculative, Your Honor.

7       THE COURT:  I'll overrule the objection.

8   Q   And did you know about your sister's plan to meet Robert

9       Luse down in Oregon?

10  A   They had mentioned it. She had mentioned it to me.

11  Q   You knew about them?

12  A   Sure.

13  Q   You knew she was going to rendezvous with him in Oregon

14      then?

15  A   I knew that she had mentioned it as a possibility they

16      might.

17  Q   There was a plan, wasn't there?

18      MR.  MENENDEZ:    Your  Honor,  counsel  is  getting

19  argumentative.  It's been asked and answered.

20      MR. WEIDNER:  No, Your Honor.

21      THE COURT:  I'll overrule the objection.

22  Q   There was a plan, wasn't there?

23  A   I don't know that there was a solid plan.  I know that it

24      had been mentioned, the possibility.

25  Q   Was there a weak plan?

AURORA COURT REPORTING

804

1   A    Maybe.  Probably a plan.

2   Q    A fairly firm plan?

3   A    All I know is that they had -- she had mentioned it to me

4       that there was a possibility he would come down.

5   Q    All right.  And you called Mr. Luse and told him not to

6       go down there, didn't you?

7   A    No, I did not.  I called him and let him know that she

8       was in town.

9   Q    Didn't you call Mr. Luse and tell him the plan was off

10      and not to meet in Oregon?

11   A    I believe I told him that she was in town.

12   Q    Okay.  Do you remember calling Mr. Luse on the day that

13      Mr. Luse told you that his wife had had the problem with

14      the gun at the airport?

15   A    Correct.

16   Q    Okay.  That his wife had pointed a gun at him at the

17      airport?

18   A    I know that there was an altercation or an argument

19      between the two of them.

20   Q    And a gun was pointed at the airport by Penny Luse at Bob

21      Luse, right?

22      MR. MENENDEZ:  Your Honor, I -- this is hearsay.  We'll

23 be calling Bob Luse as a witness when it's clear ......

24      THE COURT:  I'll sustain the objection as to hearsay.

25      MR. MENENDEZ:  Thank you.  He can ask the question of Mr.

AURORA COURT REPORTING

805

1    Luse.  We'll be calling him.

2    Q    But you do remember the conversation .....

3         MR. WEIDNER:  I need to locate a document, for a moment,

4    Your Honor.

5         (Pause - side conversation)

6    Q    Do you -- did you talk to Jessica Black, the paralegal

7         assistant to Mr. Menendez on August 7th, 1993?

8    A    Yes, I did.

9    Q    Did -- there's a memorandum here that says Terry Leberman

10        had told Susan Ron had suspected that Diane was going to

11        meet .....

12        MR. MENENDEZ:  Yeah, I .....

13        THE COURT:  I'll sustain the objection.

14        MR. MENENDEZ:  Yes, Your Honor.

15        MR. WEIDNER:  Let me ask it a different way.

16   Q    Did you tell Jessica Black that it was true that Diane

17        was going to meet someone in Oregon?

18        MR. MENENDEZ:  Miss- -- Your Honor, it's a misstatement

19   of what was offered.  He can just read it.

20        MR. WEIDNER:  Well, that's what I tried to do, Your

21   Honor.

22        MR. MENENDEZ:  He's not reading it, Your Honor.

23        MR. WEIDNER:  May I read it?

24        THE COURT:  May I see it?

25        MR. WEIDNER:  For the record, Your Honor, it's a

AURORA COURT REPORTING

1  memorandum from Jessica Black to Mr. Menendez.   And Your

2  Honor, I'll be glad to mark it as an exhibit and admit it.   If

3  fact, I'd ask we do that, we mark it as an exhibit, admit it

4  and publish it to the jury.   I'd -- I'll offer a stipulation

5  to Mr. Menendez that the jury gets to read it.

6        THE COURT:   I'm going to ask you to refrain from remarks

7  until I can look at it.

8        MR. WEIDNER:   Certainly.

9        (Pause)

10       THE COURT:   I'll allow you to ask Ms. Vik what she told

11 Ms. Black.

12       MR. WEIDNER:   And Your Honor, could I get this marked as

13 an exhibit?

14       THE COURT:   You can.

15       MR. WEIDNER:   Defendant's first in order.   May I approach

16 the Clerk?

17       THE COURT:   You may.

18       (Pause - exhibit marked)

19 BY MR. WEIDNER:

20 Q    I'm going to go slow here so you can follow me.   All

21      right?   I'm going to ask you questions about what you

22      told Ms. Black on August 7th, 1993, a little more than a

23      month or so ago.   Did you tell Jessica Black, that is the

24      paralegal assistant to Mr. Menendez and to Ms. Bachman,

25      that Diane had talked to Bob Luse about meeting her in

                    AURORA COURT REPORTING

1 investigator has informed me that it appears the witnesses are

2 outside in the hall conversing.   I don't know if they're

3 talking about the case or not.   But if they are, I'm very

4 concerned.   We haven't been party to their conversation so we

5 don't know precisely what they're talking about.   But .....

6   MR. MENENDEZ:   They have been brought down here to ease

7 the flow of this trial.   They've been told in no uncertain

8 terms they're not talk about the case.   I presume they're not

9 doing that.

10   THE COURT:   Mr. -- are you ready to call your first

11 witness?

12   MR. MENENDEZ:   We are, Your Honor.

13   THE COURT:   Your next witness?

14   MR. MENENDEZ:   She's in the courtroom now, Ms. Armstrong.

15   THE COURT:   All right. Just stay right there, Ms.

16 Armstrong.   We're going to bring the jury in.   Thanks.

17   (Pause)

18   MR. WEIDNER:   Your Honor, can we approach the bench for

19 a moment?

20 2375

21   (Beginning bench conference)

22   MR. WEIDNER:   Is it clear that she's not going to say

23 what WISH stands for, Women In Safe Homes?

24   MR. MENENDEZ:   What I received from Adrienne was the fact

25 that she can talk about what WISH stands for, after the

1  authentication issue is established.

2      THE COURT:  No.  She can say WISH, but she can't say what

3  the acronym stands for.

4      MR. MENENDEZ:  Let me make sure of that.  Thank you.  Let

5  me walk back and tell her that to make sure she can't say it.

6      MR. WEIDNER:  Fine.

7      (End bench conference)

8  2395

9      (Jury present)

10     THE COURT:  Mr. Menendez, your next witness?

11     MR. MENENDEZ:  Thank you, Judge Weeks.  The State of

12  Alaska, at this time, Judge, let me call Ms. Vicky Armstrong.

13  Ms. Armstrong?

14     THE COURT:  Would you come forward, stand right here,

15  raise your right hand, and be sworn by the Clerk.

16     (Oath administered)

17     MS. ARMSTRONG:  I do.

18     THE COURT:  Have a seat here.  There's a microphone

19  attached to a little wire there.  Take it and maybe clip it

20  onto your pocket or the high part of your collar.  That's best

21  there.  Thank you.  Mr. Menendez?

22                      **VICKY ARMSTRONG**

23  called as a witness on behalf of the State, testified as

24  follows on:

25                    **DIRECT EXAMINATION**

                    AURORA COURT REPORTING

                                                    840

*I 3 · 2672*

1    BY MR. MENENDEZ:

2    Q    Ms. Armstrong, could you please state your name for the

3         record and spell your last name?

4    A    My name is Vicky Armstrong, A-r-m-s-t-r-o-n-g.

5    Q    Ms. Armstrong, where do you live?

6    A    I live in Ketchikan.

7    Q    And what do you do for a living there?

8    A    I work at WISH. I am the business manager.

9    Q    Okay.  And what does WISH do in Ketchikan?

10   A    We're a 24 hour shelter for victims.

11        MR. WEIDNER:  Your Honor, I object to this.  It's totally

12   inappropriate.   There's  no  indication.   I  mean,  this  is

13   absolutely inappropriate.

14        THE COURT:  I'll sustain the objection.  Mr. Menendez,

15   you may continue.

16        MR. WEIDNER:  Your Honor, would you give a cautionary

17   instruction to the jury that that testimony is -- I move to

18   strike the testimony. It's totally inappropriate.  There's no

19   showing of any relevance to that type of testimony in this

20   case.

21        THE COURT:  The testimony that's being offered in this

22   case, Ladies and Gentlemen, has been allowed for the limited

23   purpose relating to the possible state of mind of Diane Wyatt

24   at the time that she made the statement to these people, if

25   you find that she made the statement. You may not consider it

AURORA COURT REPORTING

1   in any fashion for the truth of the matter asserted.  And it's

2   being offered to show that she went to this organization to

3   get help with respect to obtaining divorce, as I understand

4   it, and not for any other purpose.

5        To the extent that the agency does other things, that's

6   not what this evidence is being offered for.  To the extent

7   that Ms. Armstrong testified about the shelter, that was not

8   what Ms. Wyatt was called about here.

9        MR. WEIDNER:  And Your Honor, in view of the prosector's

10  eliciting this testimony in violation of previous rulings I'd

11  ask for a mistrial.

12       MR. MENENDEZ:  There is no violation of rule, Your Honor.

13       MR. WEIDNER:  There is, Your Honor.

14       MR. MENENDEZ:  That is improper.

15       MR. WEIDNER:  I'd ask for -- this is inappropriate.  I'd

16  like to try this case on admissible evidence.

17       MR. MENENDEZ:  So would I.

18       THE COURT:  I'll deny the motion.  You may ask questions.

19       MR. MENENDEZ:  Perhaps we can -- should approach the

20  bench, Your Honor, with my next question.

21  2558

22       (Beginning bench conference)

23       MR. MENENDEZ:  I need to establish a foundation for

24  purposes of the rule to get this in as business records.  Now,

25  I don't know what her response is.  She's not supposed to talk

AURORA COURT REPORTING

1  on victimization at all. She knows that. So I think that was

2  inadvertent on her part. But she's going to go through the

3  litany what this organization does to establish the business.

4  Because Phil's come across and say it's not a business record.

5  So you got a suggestion?

6      THE COURT: No, no, no, no. You can ask her this

7  question, is this a women's support group that gives advise

8  with respect to divorce. And she can say yes. She's not to

9  say anything else.

10      MR. WEIDNER: Your Honor, I'd suggest you excuse the jury

11  (indiscernible - lowers voice).

12      THE COURT: No, I'll do it right here, if I can. Let me

13  tell you to ask -- how to go -- you can ask her if she works

14  for WISH and if it's a women's support group that gives people

15  -- gives women advice with respect to divorce. She's to say

16  yes, nothing else.

17      MR. MENENDEZ: My concern, Judge, is I've got to make a

18  foundation for the rule as a business record. I'm going to

19  put as much as I think I need to get into. I'll be very, very

20  parsimonious, but if there's an objection, that we need to get

21  enough in for the rule in there.

22      THE COURT: I believe that you violated the rule -- the

23  order of the court with your other que- -- or with her

24  response in any case.

25      MR. MENENDEZ: Okay. And .....

AURORA COURT REPORTING

1    21st, as offered in Exhibit No. 10?

2  A    Well, I was in the office, happened to be alone at the

3    time.    I believe we were short staffed.    So I was

4    answering the phone and -- and this -- a phone call came

5    in from a woman who wanted information on divorce.    And

6    I said that we could -- we could offer that information.

7    And she said that -- that she wanted the information.

8    And I said, well, the best thing to do would be to come

9    in and talk to someone, to sit down and so she made an

10    appointment to do that for two days later.

11  Q    And what appointment did she make, for what date?

12  A    She made it for Friday at 1:00 o'clock .....

13  Q    Okay.

14  A    ..... which would have been the 23rd.

15  Q    And she called you on the 21st?

16  A    That's correct.

17  Q    Did she identify herself?

18  A    I asked her her name and she said that it was Diane

19    Wyatt.

20  Q    Why did you ask her her name?

21  A    I asked her her name because when she said that she

22    wanted the di- -- the divorce information that there was

23    a possible lethal situation when she told her husband

24    about it.    And I was -- at that point I wanted to get her

25    name.    I was real concerned about that.

AURORA COURT REPORTING

1  Q    Did she make any further statements of the -- of this

2       issue?

3  A    Well, after she said that statement, I -- I said, well,

4       are -- are you going to be safe, you know, until you come

5       in on Friday, and she said, if she kept her mouth shut

6       she would be.

7       MR. MENENDEZ:   At this time, Your Honor, I have no

8  further questions.  Thank you.

9       THE COURT:  Mr. Weidner?

10      MR. WEIDNER:  Thank you.

11                    **VICKY ARMSTRONG**

12 testified as follows on:

13                    **CROSS EXAMINATION**

14 BY MR. WEIDNER:

15 Q    Hello.  I'm Philip Weidner.  I represent Ron Wyatt, the

16      citizen who has been accused in this case.  Just a couple

17      questions for you.  It's true, is it not that in

18      describing her situation to you that she was not

19      hysterical or crying or any of those things?

20 A    That's correct.  She was very calm.

21      MR. WEIDNER:  No further questions.

22      THE COURT:  Mr. Menendez?

23      MR. MENENDEZ:  We have no further questions for this

24 witness, Your Honor.  But there's a matter I'd like to bring

25 up outside the presence of the jury as to matters raised

1  Q  Was there any discussion from you or any offer from the

2     defendant, Mr. Wyatt, in this case, as to the victim in

3     the Hilbish case? Let me back up a little bit. In fact,

4     I'm sorry. What was your understanding of what happened

5     to the victim in the Hilbish case?

6  A  My understanding was that it was a horrendous crime and

7     that just what had happened was there had been a body

8     that was wrapped in a tarp and left out in the open for

9     a period in excess of three weeks, that was right below

10    my kitchen window. And that a man had been killed.

11 Q  What do you mean right below your kitchen window?

12 A  My kitchen window opens up to where I could see the yard

13    where the man's body had laid. But I didn't know.

14 Q  Now, when that was being -- was that discussed in the

15    office with Mr. Wyatt?

16 A  It had -- it -- it had not been discussed during the

17    entire length of the trial up until the last week of the

18    trial.

19 Q  Was there an incidence where you and Mr. Wyatt discussed

20    the circumstances of the tarp and the body?

21 A  Yes, there was.

22 Q  What did he say?

23 A  He said, if it were my wife, I would wrap her in a tarp,

24    then I would tie it securely and I would weight it down

25    and they would never find her.

AURORA COURT REPORTING

931

```
 1    -- the .....

 2  A  The teal green Gor-Tex jacket I had seen before.  It was

 3     fairly new.  But I had seen her wearing that.

 4  Q  And what about the -- anything distinctive about her

 5     jeans?  Anything contrary or atypical?

 6  A  Well, the jeans were older.  Usually when she came into

 7     town she'd dress up in maybe newer jeans.  And these

 8     seemed a little more worn.  Definitely not her best

 9     jeans.

10  Q  When she left you on the 22nd of October, you indicated

11     in your earlier testimony that she left, and in fact, she

12     walked you back to the office?

13  A  Yes.  That's correct.

14  Q  And then do you know what direction she walked when she

15     left you?

16  A  I believe she headed toward the main Tongass -- towards

17     the water front.

18  Q  Okay.  If you can, .....

19     MR. MENENDEZ:  May I step around?

20     THE COURT:  You may.

21     MR. MENENDEZ:  Thank you.

22  Q  Ms. Vik, I want to ask you about a -- I speak as I talk

23     (sic), so if you don't hear let me know, about a diagram

24     of -- testified to of downtown Ketchikan.  Excuse me.

25     MR. MENENDEZ:  Has this been marked, Madam Clerk?
```

AURORA COURT REPORTING

1178

1    your luncheon date, I think your earlier testimony was

2    about 2:00 o'clock?

3  A    You talked about things in her life?

4  A    During the lunch we talked about how .....

5  Q    You talked about it already. I just ......

6  A    Right.

7  Q    What was her demeanor when she left, how was she feeling?

8  A    She was feeling pretty good. I'd say, yes. She were --

9    felt good, a little bit excited. I think our talk was

10    good for her.

11  Q    Did she tell you where she was going?

12  A    Yes, she did.

13  Q    Where did she say she was going?

14  A    She was going to meet a co-worker at the Y at Harriet

15    Hunt Lake.

16  Q    Okay. And did she say who that co-worker was?

17  A    Yeah.

18  Q    And who was that co-worker?

19  A    Bob Luse.

20  Q    Was this the first time you had ever heard her mention

21    the name Bob Luse in terms of whatever relationship had

22    been attained at that point?

23  A    No. She had mentioned him before.

24  Q    When was the first time that you ever -- withdraw that.

25    Where does Bob Luse work?

AURORA COURT REPORTING

1   A   He works at Alaska Airlines at the airport.

2   Q   How long have you known Bob Luse?

3   A   Probably four or five years.

4   Q   And what does he do at the airport?

5   A   He's a mechanic for Alaska Airlines.

6   Q   When was the first time you heard your sister, Diane,

7       mention the name, Bob Luse in a capacity -- and these are

8       my words, as long as there's some -- in a capacity, you -

9       - that could be characterized as a confidante or

10      something more than simple friend or acquaintance?

11  A   I don't know that I can pin an exact date on it.  They

12      talked at work for some time through -- through the years

13      that he worked there.  I believe he came out and looked

14      at a motor on their boat because it wasn't functioning

15      during the summer sometime.

16  Q   On whose boat?

17  A   Diane and Ron owned a boat together, a 21 foot boat.

18  Q   Is that -- have you ever been on that boat before?

19  A   Yes.

20  Q   Does it have anchors?

21  A   Yes.

22  Q   Does it have a chain?  If you remember?

23  A   I -- I'm -- I couldn't tell you clearly about the chain.

24  Q   Okay.  Getting back to -- you said that Bob Luse had

25      worked on a boat or .....

1  A   He had just done -- being a mechanic he had some

2      mechanical knowledge. And there had been a problem no

3      one had been able to figure it out. And Ron didn't want

4      to pay to have it taken in and have an overhaul or

5      whatever so Bob offered to come out and take a look at

6      it.

7  Q   Back to my question. At what point in time -- if you can

8      answer it, did the name Bob Luse surface and it's -- and

9      there was suggestion or characterization that it was

10     something -- the relation for contact was something

11     greater than a simple friend from work, that another

12     relationship had been attained, whatever that

13     relationship was. We'll talk about that in a second.

14 A   I'd say probably around maybe the middle to the end of

15     August, for like -- there's no real date there, that she

16     mentioned that they had been talking at work, more so,

17     perhaps, than just regular conversations.

18 Q   Okay. Did your sister, Diane, ever speak with you about

19     an instance where your sister Diane and Bob Luse had

20     taken a walk by Ward Cove Lake or something or another

21     lake -- excuse me, another area of water?

22 A   Yes. She did mention that they had met one point again -

23     - and this may have been the end of August, and we're --

24     I'm not real clear on this date, and taken a walk around

25     Ward Lake and just talked.

1    Q    Ward Lake is where in Ketchikan?

2    A    It's probably about seven -- well, probably about three

3         or four miles north of the downtown area.

4    Q    Okay.  So we'll hear about that a little bit later.  How

5         did she characterize the talk or the walk or what they

6         did?

7    A    Well   ...

8    Q    How did she feel about it, better yet, based on what you

9         saw and heard?

10   A    Well, Diane was a very private person.  She wasn't a

11        person who shared her real deep feelings with anyone

12        basically outside the family, outside of myself and

13        Gretchen.  And I think that this -- she had started

14        opening up to Bob about the problems in the marriage.

15        There was the concerns that she had with the marriage,

16        things that she had done to try and make it work.  And I

17        think that she found Bob a very easy person to talk to

18        and he was a good listener.  And she did have to meet

19        people that she could talk to.

20   Q    Did your sister have any issues as to self-esteem at that

21        point?

22   A    Yes.  Ron -- I -- Ron had been picking away at her

23        through the years and finding fault with about everything

24        that she did.  And she -- she did not have a good sense

25        of self-esteem.  Which -- which was hard for me to

AURORA COURT REPORTING

1  Q   Okay.  And you went to your sister's house at about 9:30

2      on the 22nd?

3  A   Yes.

4  Q   and you asked Mr. Lu- -- Mr. Wyatt, the defendant, where

5      your sister was?

6  A   That's right.

7  Q   And he didn't know?

8  A   He said he had no idea.

9  Q   Okay.  Now, when you spoke to him on the 23rd, you said

10     it was sometime after 3:00 o'clock?

11  A  I think so.  I think it was around 3:30.

12  Q  Okay.  Now, did he indicate when he could have spoken to

13     your sister and had this communication that they were

14     going to give it another try?

15  A  No, he didn't say when he had talked to her.  But he --

16     he said he had seen her that morning in bed -- Friday

17     morning, in bed, before he went to work; that that was

18     the last time he had seen her.

19  Q  Okay.  Now, did he say where she was in bed when he saw

20     her on the 23rd?

21  A  In the pink room.

22  Q  Okay.  Would -- he exhibit any confusion about that

23     declaration or .....

24  A  No, he seemed pretty clear that she had been -- she had

25     slept in the pink room.  And they were sleeping in

1    separate bedrooms at that point.

2  Q    Okay.  After that, did you have contact with the Alaska

3    State Troopers?

4  A    Yes.  We -- Trooper Cox had come in and asked some

5    questions, looked at the vehicle and later, probably

6    around 4:00 o'clock, Trooper Hall came -- came down to

7    the house.

8  Q    And these were Alaska State Troopers?

9  A    Yes.

10  Q    Okay.  In the conversations you had with your sister

11    regarding the events of her life and as you've indicated,

12    her desire to end this relationship,  did you discuss

13    with her the circumstances of her financial life and

14    those things personal to her?

15  A    Yes.  We had some conversations on that.

16  Q    Okay.  At some point in time, specifically during the

17    month of September, 1992, did you just -- did she discuss

18    with you the issue of a safety deposit box?

19  A    Yes, it was, I believe on the 21st.  It was the day after

20    Ron had come to the boat.  She came to my office.  She

21    was off that week.  And said that she had told Ron she

22    wanted out of the marriage, that she wanted a divorce,

23    and so she was going to start taking steps to -- towards

24    that direction.  She said that most of her -- her money

25    were in separate accounts.

AURORA COURT REPORTING

1248

1 relevant as to whether she knew about the gun incident at the

2 time she formed these concerns.

3 MR. MENENDEZ: Relevant in Mr. Weidner's mind, maybe not

4 the witness' mind or in the jury's mind.

5 THE COURT: I'll overrule the objection. You may answer

6 the question. You may answer the question.

7 Q You knew about the gun incident at that time, didn't you?

8 A I was aware that -- Bob had told me that they had an

9 argument the day prior to that. That he and Penny had

10 had an argument.

11 Q On the dock?

12 A The airport parking lot, I believe.

13 Q That he hadn't come home all night? You knew that,

14 didn't you?

15 A I'm sorry.

16 Q He told you that he hadn't come home all night, right?

17 A I don't rem- -- recall that.

18 Q Well, I'll get to that in a second then. But he told you

19 that there had been an argument at the airport docks in

20 Ketchikan, between him and his wife, right?

21 A Yes.

22 Q And that a gun was involved?

23 MR. MENENDEZ: Your Honor, again, the same objection. If

24 Mr. Weidner wants to go over this subject this witness has no

25 independent information on. We'll call Mr. Luse as a witness.

AURORA COURT REPORTING

1    as I know.

2  Q  All right.  Now, I understand you're not a surveyor and

3     you probably don't know the exact property line.

4     But.....

5  A  No.

6  Q  But would it be fair to say that that photograph, Exhibit

7     6, shows part of your sister's property and part of the

8     neighbor's property?

9  A  As far as I know, yes.

10 Q  All right.  And you don't have to approach the jury.  But

11    could you just hold it -- would you hold it up to the

12    jury so they can see which photograph we're talking

13    about?

14 A  (Witness complies with request)

15 Q  Now, at the end of the day yesterday, I was asking you

16    some questions about the gun incident with Mr. Luse?

17 A  Yes.

18 Q  And isn't it true that the first time you told the police

19    and the prosecution about that incident was on August

20    10th, 1993 -- or actually, August 7th, 1993?

21 A  I believe so.

22 Q  Okay.  And you said you believe so.  And I appreciate

23    your belief.  But let me make sure you're correct on

24    that.

25    MR. WEIDNER:    And let me approach the witness with

AURORA COURT REPORTING

1324

1  Exhibit A.

2  Q    This might help you recall the exact date, this

3       memorandum to Jessica Block -- Black. You talked to her

4       on August 7th, 1993, didn't you?

5  A    Yes, I did.

6  Q    And that's the first time you ever told her or the

7       prosecutor or any police officers about Penny Luse

8       pointing the gun at Bob Luse, isn't it?

9       MR. MENENDEZ: Your Honor, that's not what the -- again,

10 the same objection.

11      THE COURT:    I think that the witness may answer the

12 question and if it's not -- if the underlying assumption is

13 not what she said, then she may say so.

14 Q    That's the first time you ever told them about Penny Luse

15      pointing the gun at Bob Luse, isn't it?

16 A    Yeah, I believe that's the first time I -- I mentioned

17      that.

18 Q    Okay. Again, would you raise your voice, please, so the

19      jury can hear you? That's -- you did say that's the

20      first time you mentioned that?

21 A    Yes. (Indiscernible - lowers voice).

22 Q    So that was almost a year after your sister's

23      disappearance?

24 A    Yes.

25 Q    And also a year after Mr. Wyatt's arrest?

AURORA COURT REPORTING

1   A     Correct.

2   Q     And almost a year after the police questioned Bob Luse

3          concerning his meeting with your sister before she

4          disappeared?

5   A     Ap- -- approximately, yes.

6   Q     And you said the first time you mentioned it.  You had

7          previously mentioned it to the family, hadn't you?

8          MR. MENENDEZ:  Objection as to specificity question, Your

9 Honor; family.

10        THE COURT:  I'll overruled the objection.

11   Q     You had previously mentioned that incident to the family,

12         hadn't you?

13   A     I don't believe so.

14   Q     Do you recall on the Friday afternoon, that is the 23rd

15         when the family was out at the house with Mr. Wyatt?  You

16         remember that afternoon, don't you?

17   A     I remember that afternoon, yes.

18   Q     And so the jury understands, who was present at that

19         gathering, so to speak?

20   A     You want me -- you want to know who was present then?

21   Q     The names, please, so the jury can remember who was

22         there?

23   A     Okay.  I was there.  Sven Karlsson.

24   Q     Again, keep your voice up, please?

25   A     Okay.  Gretchen and Jimmy Severson, Pete Moore and Chris

1      and Laura Moore.

2  Q   And there was considerable discussion at that time about

3      the subject of your sister's appear- -- disappearance,

4      correct?

5  A   We were asking Ron where -- if he knew where Diane was.

6  Q   Okay.  Did you -- didn't you discuss with someone there

7      in a voice loud enough that Mr. Wyatt could hear it, the

8      incident with the gun at the dock concerning Penny Luse?

9      You talked about that, didn't you?

10 A   I don't believe so.

11 Q   So you didn't tell anyone then?  You were concerned about

12     your sister's disappearance, and you didn't tell anyone

13     there that she was on her way to meet Bob Luse, and that

14     Bob Luse's wife had pulled a gun two days before?

15 A   I told investigators that evening that she had -- was

16     going to meet Bob Luse on Thursday.   His domestic

17     situation, I did not mention. I didn't think that was --

18     had a bearing, I guess, at -- at the time, so I didn't

19     think that that was something I (indiscernible - lowers

20     voice).

21 Q   Now, you started talking about the investigators.   My

22     question is, you didn't tell anyone in the family about

23     that meeting that you knew that Bob Luse's wife had

24     pulled a gun on him two days before?

25 A   I don't believe so.

AURORA COURT REPORTING

1327

1  message?

2 A I really don't know.

3 Q You told us yesterday on direct examination that your

4  sister had told you that Bob Luse had said that he found

5  her attractive?

6 A Yes.

7 Q Said she was an attractive woman?

8 A Yes.

9 Q Is it fair to say that you understood her to be telling

10  you that Bob Luse had said that he wanted to have some

11  type of a relationship with her, is that correct?

12 A No.

13 Q Did -- with regard to your Grand Jury testimony, you

14  didn't tell either Grand Jury about the gun incident, did

15  you?  I'm talking about the Penny Luse gun incident?

16 A No.

17 Q And you didn't tell either Grand Jury about Bob Luse

18  telling your sister that he found her attractive, did

19  you?

20 A I don't believe that came up.

21 Q Is that a no?  You didn't tell them, did you?

22 A No, because I wasn't asked.

23 Q And -- but they did ask did your sister indicate to you

24  that she was carrying on any kind of a romantic

25  relationship with Mr. Luse and you said .....

AURORA COURT REPORTING

1353

1    MR. MENENDEZ:  Could I have a page, please?

2    MR. WEIDNER:  Page 100.

3  Q  They asked you that, didn't they?

4  A  And she was not carrying on a romantic relationship.  And

5     I told them that she was not.

6  Q  But you didn't tell them anything about the fact that he

7     had told your sister he found her attractive?

8  A  No.  I -- to me that's not a romantic relationship.

9  Q  And you didn't tell the Grand Jury anything about their

10    meetings and plan to meet in Oregon, did you?

11    MR. MENENDEZ:  Mischaracterization of testimony, Your

12  Honor.

13    THE COURT:  Overruled.

14  Q  You didn't tell the Grand Jury that, did you?

15  A  I don't think that came up in the Grand Jury, no.

16  Q  You didn't even tell the police about that, did you until

17    August of '93?

18  A  I -- I told them about the meeting with Bob Luse at Ward

19    Lake, which I -- and I knew that they were going to

20    question him and talk to Bob Luse.  And I left it at

21    that.

22  Q  Is that a no?

23  A  I did not -- no, I did not bring it up.  I did not

24    mention that.

25  Q  You didn't tell them about the meet- -- planned meeting

AURORA COURT REPORTING

1354

1    say you hear it in times of stress?

2  A  I hear in times of danger, you might say, or stress,

3    however you want to say it.

4  Q  Well, you previously have said it comes to you in times

5    of stress, right?

6  A  Okay.

7  Q  On or about the 20th of October, 1992, you were under

8    considerable stress, weren't you?

9  A  Yes, sir.

10  Q  And on the 21st of October of 1992, you were still under

11    that stress, weren't you?

12  A  Yes, sir.

13  Q  And on the 22nd of October, 1992 you were still under

14    that stress, weren't you?

15  A  The 22nd?

16  Q  Yes.

17  A  No, not really.

18  Q  Well, on the 20th is when your gun -- when your wife had

19    the incident with the gun at the airport, right?

20  A  Yes, sir.

21  Q  The stress was still there on the 21st, wasn't it?

22  A  We had made up and it was pretty well gone.

23  Q  How often did that inner voice come to you?  How many

24    times over the years have you heard that inner voice?

25  A  Twice in Vietnam.  It saved my life both times.

AURORA COURT REPORTING

1479

1  Q   How about since then, how many times have you heard it?

2  A   Once in the Coast Guard.

3  Q   How about since then?

4  A   And the day that -- that I talked to Trooper Cox, that

5      day.  I forget the date when I talked to (indiscernible -

6      dead microphone).

7  Q   Well, you say the inner voice told you to go out on the

8      water?

9  A   Yes, sir.

10 Q   Because you knew she was in the water?

11 A   I didn't know it.  It just told me that she's in the

12     water.

13 Q   And how long were you -- which day was it that you were

14     on the water?

15 A   Which day was it?

16 Q   Yes.  How long was it after the -- you were supposed to

17     meet -- we have a diagram here.  After you were supposed

18     to meet Diane Wyatt at Harriet Hunt Y, how long was it

19     after that, that you went out on the water?  Was it the

20     next day?

21 A   It was after I searched the area with my truck looking

22     for Diane.  I went out on the water.

23 Q   It was the next day, wasn't it?

24 A   The next day?  No, it was the same day.

25 Q   The  next  day  after  you  were  supposed  to  meet  or

AURORA COURT REPORTING

1480

1     rendezvous with Diane Wyatt at the Harriet Hunt Y, you

2     admit that you were out on the water, correct?

3  A  Oh, I'm sorry.  I'm sorry.  I'm sorry.  You're right.

4     I'm wrong.

5  Q  And how long were you out on the water?

6  A  About an hour.

7  Q  And you were in your boat?

8  A  Yes, sir.

9  Q  And where is that boat lo- -- where was that boat

10     located?

11  A  It's tied up at Knudsen Cove.  Right here.

12  Q  I'm showing you Defendant's or Plaintiff's 33.  Would you

13     take that pointer, please, and show the jury where

14     Knudsen Cove is?

15  A  I'll stand up here so I can see.

16  Q  Sure.

17  A  There's the school.  This is Knudsen Cove right here in

18     that little spot there.

19  Q  And can you show the jury where the Wyatt residence would

20     be?  It might help you to look in this arrow right here.

21  A  Well, I can't tell exactly.  But that arrow is pretty

22     close, if that's not it.

23  Q  And how long did it take you to take your boat and go

24     from Knudsen Cove to the Wyatt residence?

25  A  To the Wyatt residence itself?

AURORA COURT REPORTING

1      don't have to keep a record, do you?

2  A   No, sir, you don't.  However, I don't take used weapons.

3  Q   Okay.  Have the police ever checked your gun records to

4      see if there's any record of a .25 in those records?

5  A   No.

6  Q   Have the police ever checked your wife's gun records to

7      see if there's ever -- if there's a record of a gun?

8  A   No.

9  Q   And by .25 I'm talking about a .25 caliber pistol?

10  A   Yes, sir.

11  Q   In terms of questions about what the police may or may

12      not done, at one point in time they interviewed you and

13      told you that they were basically checking after the

14      fact, so to speak to see if you had an alibi.  Do you

15      remember that interview?

16  A   Nobody checked to see if I had an alibi, yes.

17  Q   Well, they interviewed you some weeks after the

18      disappearance of Diane Wyatt, didn't they?

19  A   Yes, sir.

20  Q   All right.  Have they ever taken a blood test from you?

21  A   A blood test?

22  Q   Yes.  They've never taken a sample of your blood?

23  A   No, sir.

24  Q   Have they ever taken your fingerprints?

25  A   No, sir.

1   Q   Have they ever taken any hair samples from you?

2   A   Hair samples?

3   Q   Yes.

4   A   No, sir.

5   Q   And I know it's a bit personal, but they've never taken

6       any hair samples from your head or any pubic hair

7       combings, have they?

8   A   Negative.

9   Q   Have they ever checked your fingernails for any

10      fingernail scrapings?

11  A   No, sir.

12  Q   On or about the day -- the time that Diane Wyatt

13      disappeared, did they ever examine your body to see if

14      there was any marks on your body left from a struggle?

15  A   No, sir.

16  Q   Did they take any kind of a swab test from your hands?

17  A   No, sir.

18  Q   To your knowledge, when's the first time the police knew

19      that your wife had engaged in this conduct with the

20      firearm down at the dock?

21      MR. MENENDEZ:  We'd object, Your Honor.  It calls for the

22  witness to speculate as to the mental processes of somebody

23  else.

24      THE COURT:  I'll sustain the objection.

25  Q   Did you ever tell the police about that?

AURORA COURT REPORTING

1458

1       Lake.  I really don't remember.

2  Q  Was it before or after the fight?

3  A  I just -- I just don't remember.

4  Q  But you can remember that you saw Mr. Wyatt on 11:32 on

5      October 23rd?

6  A  Yes, sir, because I wrote it down in my book.

7  Q  But you can't remember when it was you wrote these two

8      love letters to Diane?

9  A  No, I cannot.

10  Q  And you can't remember what was in them?

11  A  No.

12  Q  And you can't remember when you told your wife that you

13     were seeing her secretly?

14  A  I can't remember when I told her I was trying to help

15     her, no.

16  Q  Tell me about the inner voice that you have.  How long

17     have you had that inner voice?

18  A  Probably since 1963.

19  Q  Do you ac- -- does it actually say words to you?  It

20     does, doesn't it?

21  A  It's kind of a feeling you get that tells you things.

22  Q  Does it actually say words to you?  Sir, you actually

23     hear the voice speak to you?

24  A  I suppose.  It's kind of an intuition thing, yes.

25  Q  What kind of -- how does the voice sound when it speaks

1      to you?

2  A    How does it sound?

3  Q    Yes.

4  A    How does a thought sound, I don't know.  There's no sound

5       to it.

6  Q    Have you ever consulted anyone in connection with that

7       inner voice?  Have you ever talked to any doctors about

8       it?

9       MR. MENENDEZ:  We would object, Your Honor.  Not -- this

10  is not relevant.  And Mr. Weidner knows the record.  This is

11  improper examination.

12       THE COURT:  Approach the bench.

13  2638

14       (Beginning bench conference)

15       MR. WEIDNER:  I'm trying to find out, Your Honor, if it's

16  audio hallucinations.  And I want to know if he's talked to

17  any doctors about audio hallucinations.  I don't know if he

18  has or he hasn't.

19       MR. MENENDEZ:  He says -- that isn't going to do

20  anything.  The inner voices he's talking about in the

21  transcript of his statements, inner voices that helped him

22  survive in Vietnam, much like a cop gets or he said, much like

23  a woman's intuition.  There is no suggestion in this record

24  whatsoever of almost a dozen pages of discovery that this guy

25  has any psychological or mental problems.  That's an improper

1    question, counsel.  It doesn't have any scope of this trial.

2         THE COURT:  What's the basis of the objection, it has to

3    do with what?

4         MR. MENENDEZ:  The basis of the objection is a couple of

5    reasons.  Number one is hearsay.

6         THE COURT:  What?

7         MR. MENENDEZ:  It's hearsay, asking the fact if he's

8    consulted anybody about this issue.  Number two, is the fact

9    he's asking a question which is entirely outside the scope of

10   any examination that offered by any witness of this trial.

11        THE COURT:  Well, it's not hearsay if he talked to a

12   doctor.  And I don't think it's beyond to the extent that he

13   goes to his competency testimony.

14        MR. MENENDEZ:  It's phantom impeachment.  That's what it

15   is.  There's nothing out there.

16        THE COURT:  I'll overrule the objection.

17        (End bench conference)

18   2717

19        THE COURT:  Mr. Luse, if you remember the question you

20   should answer.  If not, Mr. Weidner will repeat it.

21   A    Would you repeat it, please?

22   Q    Yeah.  Have you ever talked to any doctors about that

23        inner voice that you hear?

24   A    No, sir.

25   Q    In terms of that inner voice that you hear, sir,  did you

AURORA COURT REPORTING

1478

1   Q   Yes.

2   A   Two, three minutes.

3   Q   And you had anchors on your boat?

4   A   Yes, sir.  Two.

5   Q   And you have chain on your boat?

6   A   Eight foot.

7   Q   And they're 25 pound anchors?

8   A   Yes, sir.

9   Q   And what kind of anchors are they?

10  A   One's a Danforth and the other is a folding leaf.

11  Q   What do you mean by a folding leaf anchor?

12  A   It's long and flat, about that long and very flat.

13  Q   All right.  Now, where is it that you actually live?

14  A   On Pond Reef which is two or three miles from here.

15  Q   And you live on the water, don't you?

16  A   Yes, sir.

17  Q   Your house is on the water?

18  A   Yes, sir.

19  Q   Not physically on the water, but you have beach front,

20      correct?

21  A   Yes.

22  Q   Do you have boats at your house?

23  A   No.  It's too shallow.

24  Q   How long does it take to go from the Wyatt residence with

25      your boat -- from the Wyatt residence to near your home?

AURORA COURT REPORTING

1482

1  A  No.

2  Q  Did they ever check your residence for any garbage bags,

3     to see if they could match them with the garbage bags

4     that the body was wrapped?

5  A  No sir.

6  Q  Pardon me?

7  A  No, sir.

8  Q  They ever search your residence?

9  A  They ever search my residence?

10 Q  Yes.

11 A  No, sir.

12 Q  They ever ask to search your residence?

13 A  No.

14 Q  They didn't -- they never took any saliva tests from you,

15    did they?

16 A  No, sir.

17 Q  They never accused you of this homicide, did they?

18 A  Accuse me?

19 Q  Yes.

20 A  No, sir.

21 Q  Did the troopers ask you about your wife's combative

22    nature, her aggressiveness?

23 A  Yes, sir.  They did.

24 Q  What did you tell them?

25 A  I told them the truth.  She's not combative.  And she's

AURORA COURT REPORTING

1486

```
 1        (Pause - side conversation)
 2   Q    When was the next time you saw the defendant on October
 3        22nd?
 4   A    He came into the -- came in through the front door.
 5   Q    And how soon after you saw him during your -- the first
 6        ten or 15 minutes of your conversation did he come in the
 7        front door?
 8   A    It would have been a half an hour later.
 9   Q    Okay.  Now, do you know what he was doing during that
10        half hour, let's say, we're talking now -- I think, if I
11        may, you said he -- you first saw him, let's say, near at
12        5:00 o'clock, am I correct there?
13   A    Right.
14   Q    So if we go a half hour, until about 5:30?
15   A    Right.
16   Q    During that half hour what was he doing if -- do you
17        know?
18   A    No, I don't know.
19   Q    Did you hear any activity downstairs?
20   A    No.
21   Q    Did he enter the house?
22   A    Not that I know of.
23   Q    Do you know where he was beside the garage?
24   A    No, I don't.
25   Q    When he came into the house, was the manner in which he
```

1  dressed when you saw him by the garage, how -- did that

2  change at all?

3 A No.

4 Q Okay.  And what did he do when he came into the house?

5 A He came in, took his shoes off, got a glass of milk from

6  the refrig and then washed his hands.

7 Q He washed his hands after the milk?

8 A Yes.

9 Q Okay.  Did you speak with him?

10 A No.

11 Q Because you were on the phone?

12 A Right.

13 Q Okay.  And where did he go after that?

14 A He went down to the basement.

15 Q And how did he get to the basement?

16 A Inside the stairwell.

17 Q Okay.  The jury hasn't heard anything this yet, so

18  looking at Exhibit No. 2 again, how does one get from the

19  upper level to the lower level of the Wyatt residence?

20  Just from the upper level?

21 A There's a spiral staircase right here.

22 Q And it takes you down to the lower level?

23 A Right.

24 Q Okay.  And you've taken that staircase before?

25 A Right.

1  Q   Now, we're -- do you know how long he was upstairs having

2      a glass of milk and then washing his hands before he went

3      downstairs?

4  A   A minute, maybe two.

5  Q   How long was he downstairs?

6  A   I'm not exactly sure.

7  Q   Okay.  When was the next time you saw him, now, we're

8      getting past 5:30.  When was the last time you saw him --

9      the next time you saw him?

10 A   Probably maybe ten minutes later.

11 Q   Okay.  Where did you see him?

12 A   Walking down to the beach.

13 Q   And from what location were you when you saw him walking

14     to the beach?

15 A   I was standing in the dining room looking out the bay

16     window.

17 Q   And was he carrying anything with him?

18 A   Yes, he was.

19 Q   What was he carrying?

20 A   He had a couple of cardboard boxes.

21 Q   In both hands or one hand?

22 A   He carried them both in his right hand.

23 Q   Okay.  Now, when he came into the house and you saw him

24     get a glass of milk, you saw him wash his hands, and I

25     think -- how far were you from him when this was

1   happening?

2 A Maybe ten feet.

3 Q Was there -- did you see any kind of cast on his hand?

4 A No.

5 Q The question was could you see it.  Was there a cast on

6   his hands?

7 A No, there was not.

8 Q Okay.  In the process of reaching for the glass of milk

9   and washing his hands, was there a display on the part of

10   Mr. Wyatt of any pain or suffering because of that

11   endeavor or suggestion to you that he was in pain?

12 A I didn't notice anything.

13 Q Okay.  When you saw him walk down to the beach, was there

14   any suggestion he was in pain or suffering?

15 A No.

16 Q Okay.  Now, how was he carrying these boxes, in his right

17   hand or left hand?

18 A It was in the right -- the right hand.

19 Q Okay.  How was he carrying these boxes?  Maybe you can

20   just describe for me, pretending I'm Mr. Wyatt and your

21   observation from the kitchen.  Tell me where you want my

22   right hand.  I'm sorry, sir.

23 A Up about shoulder height.

24 Q Tell me to stop.

25 A Right there.  Maybe a little lower.  Right about there.

AURORA COURT REPORTING

1696

1  Q  Were the boxes touching his sides?

2  A  No.

3  Q  So they're kept away from his sides?

4  A  Yes.

5  Q  How many boxes were there?

6  A  Two.

7  Q  Okay.  Were they big boxes?

8  A  Maybe two feet by two feet.

9  Q  Boxes, cardboard, steel, plastic?

10  A  Cardboard.

11  Q  You ever seen boxes like that before?

12  A  In the house or .....

13  Q  In general?

14  A  Yes.

15  Q  Are they collapsible or .....

16  A  Yes.

17  Q  Okay.  He took this to the beach, you said?

18  A  Yes.

19  Q  And what did he do at the beach?

20  A  He started a fire.

21  Q  Okay.  I'm going to ask you, now, if he went downstairs

22     into the basement after he had a glass of milk and washed

23     his hands, and you saw him gone down to the basement and

24     then you saw him go out- -- you saw him outside, did he

25     come back upstairs before he went outside and he went

AURORA COURT REPORTING

1    down through the basement?

2  A  No.

3  Q  And you indicated there are how many exits from the

4    basement?

5  A  One.

6  Q  Anybody use the door, the sliding glass door here?

7  A  Yes.

8  Q  Okay.

9  A  We never used the sliding glass door.  That's why I said

10    one.

11  Q  Why is that?

12  A  I don't know.

13  Q  And you don't remember ever using the other door?

14  A  Not exactly, no.

15  Q  Did you see what he did on the beach?

16  A  I just saw the fire.

17  Q  Okay.  And did you see him light the fire?

18  A  Not actually light the fire.  I saw -- what I saw was him

19    standing next to the fire while it was burning.

20  Q  Okay.  And this was during your telephone conversation?

21  A  Right.

22  Q  Okay.  Was there anything special or -- about that effort

23    of lighting the matter?  Was it just a simple match to it

24    or .....

25  A  I couldn't really say.

AURORA COURT REPORTING

1  Q  Was there any kind of water used or accelerants or what -

2     - what happened to the fire based on what you saw?

3  A  I saw later what -- it looked like he was dumping some

4     motor oil on it.

5  Q  Now, let's back up a bit.  Now, you said later.  Did he

6     leave the area and go somewhere else?

7  A  Yes.

8  Q  And where did he go?

9  A  I don't know.

10  Q  Did he come upstairs to you?

11  A  No.

12  Q  Okay.  So he left and came back to the fire?

13  A  Right.

14  Q  What did he have when he came back to the fire?  Could

15     you see?

16  A  I couldn't see what he was carrying.  I could -- I did

17     see him pour something on it.

18  Q  Okay.  How much time passed between when you first saw

19     him carry the boxes out and the fire began to when he

20     came up the second time?

21  A  Maybe ten minutes. Maybe five minutes.

22  Q  How big were these boxes?  Could you give me an estimate

23     in terms of size?  They're like grocery boxes, the kind

24     of boxes we issue paper in or legal boxes or .....

25  A  Well, I'd say two feet by two feet.

AURORA COURT REPORTING

| | | |
|---|---|---|
| 1 | Q | 10:15? |
| 2 | A | No, sir. |
| 3 | Q | How about 9:30? |
| 4 | A | No, sir. |
| 5 | Q | Could you see the log-sorting yard where you were |
| 6 | | located at 9:30? |
| 7 | A | No, sir. |
| 8 | Q | Could you see it at 9:45? |
| 9 | A | No. |
| 10 | Q | 10:00 o'clock? |
| 11 | A | No. |
| 12 | Q | When did you first start arriving or approaching the |
| 13 | | log-sort area, about what time of night was it? |
| 14 | A | 10:30 p.m. |
| 15 | Q | Okay.  Was there another guard on duty responsible for |
| 16 | | checking the log-sorting yard during that hour on the |
| 17 | | 22nd of October? |
| 18 | A | No, sir. |
| 19 | Q | Around 10:30 at night on October 22nd, 1992 did you |
| 20 | | locate any vehicles that were abandoned, without |
| 21 | | driver, at the log-sorting yard gate? |
| 22 | A | You're asking without a driver in the vehicle? |
| 23 | Q | Without a driver in the vehicle? |
| 24 | A | Yes, sir, I did. |
| 25 | Q | And where was it at? |

AURORA COURT REPORTING

1  A    The vehicle was parked facing the gate.  Its headlights

2       towards this yellow gate right here.

3  Q    From what area were you coming from?

4  A    I was heading south towards town.

5  Q    And where were you going?

6  A    To my next destination, down in this area.

7  Q    Okay.  And what raised your attention to see this car

8       parked there?

9  A    I saw it out of -- I looked sideways.  I always look at

10      the log-sort yard when I drive by.

11 Q    Is it unusual for people to park there?

12 A    Not necessarily, no.

13 Q    In your experience of checking the area have you ever

14      found people to be parked there, teenagers and that

15      sort?

16 A    Yes, sir.

17 Q    Okay.  Do you -- in your experience do people ever use

18      that area to relieve themselves?

19 A    Yes, sir.

20 Q    In what fashion?

21 A    They urinate.

22 Q    In your experience has anybody ever -- in your contact

23      with folks have they ever used that area to defecate?

24 A    Yes, sir.

25 Q    In your experience has anybody ever used that area to

1     walk their dog?

2  A    Yes, sir.

3  Q    Okay.  I'm going to ask you to draw a chart, if you

4     could.

5  A    Okay.

6  Q    In the exhibit (indiscernible), please, I'd like for

7     you to draw the area of the gate that we've discussed.

8  A    Yes, sir.

9  Q    And the location of the vehicle that you came upon.

10     I must ask you an embarrassing question.  Do you know

11     what the term defecation means?

12  A    Yes, sir.

13  Q    Exhibit Number 77.  Could please draw, maybe with a

14     black pen, if we have one.

15     THE CLERK:  (indiscernible, not on microphone)

16     MR. MENENDEZ:  I don't think we have it.

17     THE CLERK:  (indiscernible, not on microphone)

18  Q    Beginning, can you draw the gate, if you don't mind.

19     The area in which the car was located, the vehicle

20     itself, and then we'll talk about how you discovered

21     the vehicle.

22  A    Okay.

23  Q    You need to step aside .....

24  A    Oh, off to the side?

25  Q    Let these folks see you.

AURORA COURT REPORTING

1  A    This would be the gate.  There's a small access road

2       that leads you down into the log-sort yard

3       (indiscernible). (drawing)  (indiscernible) runs this

4       way, and that stand of trees on this side.  The vehicle

5       was parked right here with its headlights going towards

6       the gate.

7  Q    Were the headlights on?

8  A    No, sir.

9  Q    Was the car running?

10 A    No, sir.

11 Q    Okay.  Where would the North -- North Tongass Highway -

12      - excuse me.  Where would the North Tongass Highway be

13      above it?  Well, you have to put in -- hold on.  You

14      don't have to put in the exact place -- well, I don't

15      want you to draw the highway as a couple of a lines,

16      just one line would do.  Where would the highway be?

17 A    This -- this would be the edge of the -- of the highway

18      here.

19 Q    Okay.  And the distance -- approximate distance from

20      the highway to the car itself, -- to the gate itself

21      would be how long?

22 A    I'll estimate 45 to 50 feet.

23 Q    Okay.  And let me ask you a question.  Looking at

24      Exhibit Number D is there -- what color would you say

25      that line would be?

1  A    Yellow.

2  Q    Okay.  And the -- the distance from that -- what is

3       that?

4  A    That's the gate itself.

5  Q    And that's the gate (indiscernible) drew in your

6       exhibit?

7  A    Yes, sir.

8  Q    The distance from the gate to the highway would you

9       estimate-- would you estimate that to be the same

10      distance it was on October 22nd?

11 A    Yes, sir.

12 Q    Okay.  Everything else aside, in terms of what you've

13      talked about, the interior of the log-sorting yard,

14      would the area around the gate to the highway

15      essentially be how -- how the area looked in October

16      22nd?

17 A    Yes, sir.

18 Q    Okay.  You indicated you were driving back towards

19      Ketchikan?

20 A    Yes, sir.

21 Q    And did you pull a U'ey?

22 A    Yes, -- well, I turned off into the sort yard parking

23      lot at an angle like this and around.

24 Q    And what did you do?

25 A    I parked my vehicle heading this direction.

1  Q  Can you please draw your vehicle?

2  A  Yes, sir.  (complying)

3  Q  What kind of vehicle was it?

4  A  15-passenger Ford van.

5     MR. MENENDEZ:  May I approach?

6     THE COURT:  (no audible response)

7  Q  I'll show you a couple of exhibits and -- Exhibit

8     Number 25 (sic), what does it represent to you?

9  A  This is a photograph of myself and the vehicle that I

10    drive, the van.

11 Q  Okay.  The van, was this the van you were driving that

12    night?

13 A  Yes, sir.

14 Q  Okay.  And was that your approximate position, the

15    vehicle as you were driving it?

16 A  Yes, sir.

17 Q  And, of course, the area around it that was a staged

18    photograph, was it not?

19 A  Yes, sir.

20 Q  Okay.

21    MR. MENENDEZ:  I'd move for the submission of the

22 photograph, Your Honor.

23    THE COURT:  What's the number?

24 A  75.

25    THE COURT:  Mr. Weidner?

1   MR. WEIDNER:  No objection.

2   THE COURT:  Exhibit 75 is admitted without objection.

3                    (Plaintiff's Exhibit No. 75

4                    admitted)

5   Q   When you came upon the vehicle, we'll call it vehicle

6       number one right now, the vehicle that you stopped.

7       Did you -- what was the first thing you did?

8   A   I put my vehicle in park.  I looked at the vehicle and

9       the area around it, did not observe anyone around it or

10      in the vehicle.

11  Q   Did you look around the surrounding area with any kind

12      of artificial light?

13  A   Yes, sir.

14  Q   What did you do?

15  A   I used a -- I have a (indiscernible) candle power

16      called a spot light.  I made an arc, starting back here

17      over to this area, started a sweeping motion like this

18      with my light out in the sort yard to see if I could

19      see anyone.

20  Q   How many degrees was that?

21  A   Probably I'd (indiscernible).

22  Q   Okay.  I'll show you Exhibit Number 24 (sic), do you

23      recognize that exhibit?

24  A   Yes, sir.

25  Q   Where are you in that exhibit?

1           THE COURT:  74.  Maybe 74?

2    A    This is a photograph .....

3    Q    74, I'm sorry.

4    A    This is a photograph of myself and the vehicle.

5    Q    There's a light in that photograph?

6    A    Yes, sir.

7    Q    Is that a staged photograph?

8    A    Yes, sir, it is.

9    Q    The light in that photograph, is that -- what is that -

10        - was that light used by you on the 22nd of October?

11   A    Yes, sir, it was.

12   Q    Okay, is that the light you used to arc the area?

13   A    Yes, sir.

14   Q    Okay.  We'll talk a little bit more about that

15        photograph in a second, but .....

16        MR. MENENDEZ:  .....for the moment I'd move for the

17   submission of Exhibit 74.

18        THE COURT:  Mr. Weidner?

19        MR. WEIDNER:  No objection.

20        THE COURT:  74 is admitted without objection.

21                         (Plaintiff's Exhibit No. 74

22                         admitted)

23   Q    Now getting back to Exhibit Number 8-D, let's mark or

24        can you show the area in which you believe that your

25        light was able to filter through into the darkness?

                    AURORA COURT REPORTING

                                                    2237

1  A    Okay.  From here I could -- I could check the log-sort
2       yard from this area here over to -- into this area in
3       here.  I made an arc, a sweeping arc.
4  Q    Did you see anybody?
5  A    No, sir.
6  Q    Now you indicated there are valleys and crevices down
7       there.....
8  A    Yes, sir.
9  Q    Did you yell out for anybody?
10 A    I don't remember (indiscernible).
11 Q    What did you do next?
12 A    I -- from my position I could see the license plate on
13      the front of the vehicle.
14 Q    What did you do with that license plate?
15 A    I called the guard that's on duty at the pulp mill.
16 Q    And what did you do?
17 A    I asked her to call the State Patrol and run the
18      license plate to find out who the registered owner was.
19 Q    Okay, and who -- who did you call?
20 A    Pat Muzzana.
21 Q    And did you get the license plate number?
22 A    Yes, sir, I did.
23 Q    Do you remember the license plate number today?
24 A    Yes, sir.
25 Q    What was the license plate number?

AURORA COURT REPORTING

1    A    CGH 848.

2    Q    Did you make an entry into a log that you kept in your

3        -- in your -- in your vehicle as to the license plate

4        number?

5    A    Yes, I did.

6    Q    Show you Exhibit.....

7        MR. MENENDEZ:  And show it to Mr. Weidner.

8    Q    Number 60.  Do you recognize this item as a blowup?

9    A    Yes, sir.

10    Q    Can you turn -- turn it over, please.  No, no, not to

11        the jury.

12    A    Oh, okay.  (indiscernible)

13    Q    For you.  Thank you.

14    A    Yes, sir.

15    Q    Okay, can you please explain why there are two -- two

16        pages, or two sides of that exhibit?

17    A    Yes, sir.  I normally log the description of the

18        vehicle and the license plate number, part of it has

19        been cut off in this photo.....

20    Q    Can you stop there for a minute.  On your original log

21        is the full license plate number noted?

22    A    Yes, sir.

23        MR. MENENDEZ:  Your Honor, -- well, .....

24    Q    Continue please.

25    A    And then when she calls me back, because there's not

```
 1   Q    Okay.  And, again, you were sitting inside your
 2        vehicle?
 3   A    Yes, sir.
 4   Q    How tall are you?
 5   A    5'9".
 6   Q    Okay.  And you estimate his weight?
 7   A    180, 185 pounds.
 8   Q    And at that -- based on what you saw back then could
 9        you please describe what he looked like?
10   A    Yes, sir.  He had on a red baseball cap, a jacket -- I
11        believe it was a (indiscernible), blue jeans and rubber
12        boots.
13   Q    What was he doing?
14   A    He was apol-- when I saw him he started to apologize
15        for being on the property.
16   Q    Did you find that to be unusual or usual, or typical,
17        or atypical?
18   A    I'd say unusual.  Most of the people (indiscernible).
19   Q    What was he saying, Mr. Hawn?
20   A    It struck me funny because he kept going over and over
21        saying how he was sorry for being out there and that he
22        had to go to the bathroom, he couldn't wait, he was on
23        his way to town and he just couldn't -- couldn't wait.
24   Q    Was he more graphic than that?
25   A    Yes, sir, he was.
```

AURORA COURT REPORTING

1    Q    How graphic?

2    A    His exact words were he had to take shit.  Excuse me.

3    Q    All right.  Did you ask him any more questions?

4    A    No, sir, I told him it was all right, as long as he

5         knew he was trespassing and didn't do it again.

6    Q    Okay.  How was he conducting himself?  What was his

7         demeanor like?

8    A    He was very excited, acting nervous.

9    Q    Did he -- how was his breathing, how did he look?

10   A    He was breathing heavy, sweating.  He was muddy from

11        the waist down.

12   Q    What do you mean muddy from the waist down?

13   A    Well, the mud in the sort yard -- I can show it to you

14        on the photograph .....

15   Q    Which photograph.....

16   A    It shows on the photograph.

17   Q    Why don't you point to a photograph that could assist

18        you, and name the photograph, please.

19   4180

20        (Tape Changed)

21   C-2130

22   0003

23        (witness microphone not working on entire tape)

24        THE COURT:  You may now show those to the jury as you

25   go along if you want.

AURORA COURT REPORTING

2245

1          MR. MENENDEZ:  The judge said it -- show these to the

2    jury and walk over .....

3    Q    .....as to what you mean by mud and what you mean by

4         sort yard, and tell us what photographs you're talking

5         about?

6    A    Okay.  This one would be Exhibit 69, it's the top of

7         the log-deck area.  And this is a good example of the

8         type of soil that's down in the -- in the log-sort yard

9         itself.  It's very porous, it stands out on your -- on

10        your clothing.  This is another example.  You can see

11        the-- the dirt in this area, it's full of wood fibers,

12        bark, all different types of heavy material.  And this

13        is Exhibit Number (indiscernible).

14   Q    The person you saw, you said he was breathing heavily?

15   A    Yes, sir.

16   Q    How do you know that?

17   A    I could hear him.

18   Q    What did you hear?

19   A    I could hear him breathing heavy, like you

20        (indiscernible) seemed like he was short of breath.

21   Q    Was your window open?

22   A    Yes, sir.

23   Q    How close were you to him?

24   A    I'd say approximately two feet.

25   Q    And the baseball cap was pulled over his -- on his

                        AURORA COURT REPORTING

1    head, of course, but close down to his ears, higher,

2    lower?

3  A  Just about here.

4  Q  Normal?  Normal.....

5  A  Yes, sir.  Normal.

6  Q  Did he say anything to you besides what you just told

7    us, what he was doing?

8  A  Yes, sir, he -- he kept going on and on about being

9    sorry for (indiscernible) he had been on medication,

10   maybe that's why .....

11 Q  I'm sorry?

12 A  He said he had been on medication lately and maybe

13   that's why he -- he had been the way he is.

14 Q  Okay.  Was he doing anything with his hands?

15 A  Yes, sir, he was wiping them like this on his pants.

16 Q  Could you please demonstrate for the jury the manner in

17   which he was doing that?

18 A  (witness complying)

19 Q  And you indicated he had mud below his waist?

20 A  Yes, sir.

21 Q  How much mud?

22 A  Right from here down.

23 Q  You must show the jury, Mr. Hawn.

24 A  I'm sorry.

25 Q  That's all right.

1    a second time?

2  A   Yes, sir, I did.

3  Q   And who did you speak to then?

4  A   Trooper Dials.

5  Q   And did you meet with Trooper Dial on any occasion?

6  A   Yes, sir, I did.

7  Q   Did he ask for you to look at a photo lineup?

8  A   At a later time, yes, sir.

9  Q   Okay.  And did you look at a photo lineup?

10  A   Yes, sir, I did.

11  Q   And did you talk to him about some concerns you had

12    about the photo lineup?

13  A   Yes, sir.

14  Q   What did you tell him?

15  A   I told him without a baseball cap and glasses I

16    couldn't pick him out of the lineup.

17  Q   Okay.  In fact, did you look at Exhibit Number 61.

18    Exhibit Number 61, is this the lineup that was shown

19    you by Trooper Dial?

20  A   Yes, sir.

21  Q   Did you tell him that you had some problems with that

22    lineup?

23  A   Yes, sir.

24  Q   What did you tell him?

25  A   I told him that without glasses and baseball cap I

AURORA COURT REPORTING

1    wouldn't be able to pick -- pick him out.

2  Q   And what did you tell him next?

3  A   He said to do the best I could and I told him I didn't

4    think the person I picked out of this lineup was the

5    person but I couldn't be sure at that point.

6  Q   Okay, who did you pick out?

7  A   Number one.

8  Q   Number one.  Okay.

9    MR. MENENDEZ:  I'd move the submission of the exhibit,

10  Your Honor, Number 61.

11    THE COURT:  Mr. Weidner?

12    MR. WEIDNER:  Could I have one question about it?

13    MR. MENENDEZ:  Foundational question, Your Honor.

14    MR. WEIDNER:  Foundational.

15    THE COURT:  (indiscernible, poor recording)

16               **LLOYD HAWN**

17  testified as follows on:

18             **VOIR DIRE EXAMINATION**

19  BY MR. WEIDNER:

20  Q   Sir, looking at Exhibit 61.

21  A   Yes, sir.

22  Q   Do some of the photographs in there appear to be

23    driver's license photos?

24  A   Yes, sir.

25  Q   Does it appear that, in fact, five of them are driver's

1  Q  Did you happen to look at the rest of her upper body and
2     her head, specifically?

3  A  Yes, sir, I did.

4  Q  What did you find?

5  A  She had three blunt trauma wounds and two bullet wounds,
6     one an entry and one an exit wound.

7  Q  Okay.  Here are Exhibits 116 and 117.  You talked about
8     the blunt -- to the head.  In Exhibit 116, was the head.
9     116, what does that show you?

10 A  116 shows two of the blunt trauma wounds to the head.
11    And these are towards the front of the head.  One, just
12    on either side of the midline.  These are crush injuries
13    which are caused either by a blunt object striking the
14    head or the head striking a blunt object.

15 Q  How much -- did you weigh Mrs. Wyatt?

16 A  We estimated her weight to be at approximately 90 pounds.

17 Q  And how tall was she?

18 A  Sixty-five inches.

19 Q  By you say her striking another object, what do you mean
20    by that?

21 A  To being forced against a wall or table, something
22    hard....

23 Q  Falling down?

24 A  Or a force being struck with.  Falling down, no.  If they
25    should -- like standing up and falling down?  No.

AURORA COURT REPORTING

3015

1    Falling off a roof, yes.

2  Q   Were you able to determine the sequence of blows to the

3    head?

4  A   No, sir.

5  Q   I show you Exhibit 104.    There should be a pointer.

6    Looking at 104, 104 offer a diagram of the injuries

7    suffered by Ms. Wyatt, three blows to the head?

8  A   They do.    The location -- I realize this is just

9    diagrammatic, but they all actually should be raised a

10    little higher than what they are.

11  Q   Do you mind doing that for me, please?

12  A   You got anything there?

13  Q   In black, in Exhibit No. 104, could you first on the --

14    yeah, be careful there. Good you're a doctor.

15  A   I got out of the (indiscernible) so I missed the step.

16  Q   You scared me when you done that.    On Exhibit 104 on the

17    left-hand side of the frontal view, would you move those

18    injuries as noted as lacerations?    Suppose you move

19    those.

20  A   They were a little closer together. And they were by the

21    -- where the hair joins the forehead.    And I won't make

22    them as elaborate as your's.    But that's what    they

23    looked like.

24  Q   Are we able to discern the black ink from the ink on the

25    exhibit?    We can determine that, can we not?

AURORA COURT REPORTING

3016

1  A    Oh, I can.

2  Q    Okay.  How about on the back view noted as lacerations.

3       Do you also change the location of that injury?

4  A    Again it should be higher up and it is closer to the

5       midline to the left, I'm sure, but not as far south.

6  Q    If possible, looking at the jury, could you -- maybe

7       using me as a model, how about that?

8  A    (Indiscernible).

9  Q    Yeah.  Could you show on me, for example, where those two

10      front lacerations would be?

11 A    Sorry about that.

12 Q    That's all right.

13 A    The to the head lacerations were just where the hair

14      meets the brow in this location, just on either side of

15      the midline at about this level.  The posterior one was

16      near the little pointy place up here and then just to the

17      left, approximately that location.

18 Q    Okay.  Thank you.  I asked you earlier, Doctor, could you

19      determine sequence of the blows.  Could you do that?

20 A    No, sir.

21 Q    You indicated there was bullet wound to the head?

22 A    Yes, sir.

23 Q    I'll ask you in a little while.  Could you determine the

24      sequence of the bullet wound as compared to the

25      lacerations to the head?

1   A   I believe that I did, yes.  Not just by looking at the

2       wounds, but for some other reasons.

3   Q   Okay.  We'll touch on that in a second.  Could you

4       describe the severity of these wounds?  And let's start

5       off with the wound in the back of the head.  Can you

6       describe the severity of that and compared to the other

7       wounds also?

8   A   This was probably the lesser of the three head wounds.

9       It was a crush blunt trauma wound.  It did destroy tissue

10      all the way through the thickness of the scalp.  In other

11      words, I could feel the head bone through the wound.

12  Q   Did it actually penetrate the skull?

13  A   No, just down to the skull.

14  Q   And the next?

15  A   The right sided frontal wound was the next more severe.

16      Again, it's a crushing wound.  It's larger.  There's more

17      tissue damage.  It had also gone all the way through the

18      scalp to the underlying skull.  The left side of the

19      wound is most severe in magnitude as far as the amount of

20      tissue destroyed and deep to the left frontal wound,

21      there's a fracture of the underlying head bone.

22  Q   Okay.  Talking about the third wound, you indicated the

23      most severe.  And if you don't mind, could you write one,

24      two, and three, in terms of order of severity; one being

25      the most serious?

1     before?

2  A   Yes, many, many times.

3  Q   And why do you do such things?

4  A   To see what was there.  To see if the -- the material

5     that's there can correlate with what the person was last

6     known to eat.

7  Q   And did you do that in this case?

8  A   I did.

9  Q   And based on your examination of Agency Case No. 92-72191

10     and based on the evidence tag affixed to that substance

11     you tested, Laboratory No. 92-2203-03, what did you find?

12  A   I found some recognizable bread-like material mixed in

13     with portions of relatively finely divided green leafy

14     material and recognizable orange material that looked to

15     me like a carrot; fragments of carrot -- or tomato skin

16     were also present.  All this was relatively intact and

17     virtually not digested.

18  Q   Did you form a conclusion based on your observations and

19     examination?

20  A   I did.

21  Q   And what was that?

22  A   That the stomach contents of this person contained

23     relatively recently ingested -- recently taken in food

24     material including carrots, a dinner roll, tomatoes and

25     a green leafy vegetable, like cabbage, lettuce, that kind

1    of thing.

2    Q    Doctor, you used the word recently.  Could you put a time

3         on how -- how much time had passed since the contents

4         which you examined, based on the evidence tag and

5         laboratory number, did that person ingest that food?

6    A    The food, in my opinion, had been taken into the stomach

7         relatively soon before, perhaps as long as roughly an

8         hour previously.

9    Q    Doctor, in your examination, does the term, fiber or

10        fibrous analysis come into play in terms of what you do

11        in this kind of situation?

12   A    Well, the material was also looked at for whatever else

13        was there.  This is what I found.  And I didn't find

14        anything else, including fibers or fibrous materials as

15        in clothing.

16        MR. MENENDEZ:  Thank you.  No further questions.

17        THE COURT:  Take a short break.  Ladies and gentlemen,

18   please do not discuss the case amongst yourselves or with

19   anyone else.  We'll take a short break and resume as soon as

20   possible.  Court will be in recess.

21        THE CLERK:  Court will be in recess.

22        (Off record)

23   0171

24        (Jury present)

25        THE CLERK:  His Honor, the Court.  Superior Court is

                    AURORA COURT REPORTING

                                          3118

| | | |
|---|---|---|
| 1 | A | Because we had the hole that it exited through. |
| 2 | Q | I know.  Is it possible that the bullet could have |
| 3 | | entered her head and did not quite -- crudely put, but |
| 4 | | not quite made it out of her head? |
| 5 | A | That -- that happens, yes, sir. |
| 6 | Q | Did it happen in this case? |
| 7 | A | I don't think so.  Can't say absolutely that it didn't. |
| 8 | Q | What would cause that to happen?  You're shot -- a person |
| 9 | | is shot in the head.  It ..... |
| 10 | A | Well, there's -- the skin does have elastic tissues.  And |
| 11 | | if your bullet is just about of omph (ph), it can stretch |
| 12 | | the skin and maybe actually poke through, but just |
| 13 | | doesn't make it all the way out. |
| 14 | Q | Do you have an opinion of whether or not this bullet made |
| 15 | | it through? |
| 16 | A | I think it made it all the way through. |
| 17 | Q | Okay.  When Diane Wyatt was shot in the head with this |
| 18 | | firearm, what part of her brain was penetrated? |
| 19 | A | It severed both cerebral hemispheres and the brain stem |
| 20 | | that connected the two in the midline. |
| 21 | Q | Would it have killed her? |
| 22 | A | Yes, sir. |
| 23 | Q | Okay.  What does the word, coup de grace mean to you? |
| 24 | A | Coup de grace, that's a French term indicating an |
| 25 | | execution  to make sure that someone is dead that has |

1    or behind because the head could be in any direction.

2    But for those -- the frontal blows, they would have had

3    to come from the frontal direction.

4  Q  By somebody who was at arm's length?

5  A  Well, depending on the implement.

6  Q  Now, I show you Exhibit 105.  It indicates a laceration

7    to the right hand?

8  A  Yes.

9  Q  Okay.  And the right hand on Exhibit No. 104, would you

10    mind circling that?  In fact .....

11  A  It looks pretty good.

12  Q  Here.  (Indiscernible - away from microphone).

13  A  Yes.

14  Q  And could you circle that, please?

15  A  (Witness complies with request)

16  Q  And on the frontal view?

17  A  (Witness complies with request).

18  Q  Do you have an opinion based on your expertise in this

19    area as to the manner in which the laceration on the left

20    pinky was found?

21  A  This is extremely consistent with a defensive wound.

22    It's -- it's the type of wound that you put your hands up

23    to protect yourself from a blunt object coming at you.

24  Q  Do you know if that wound to the pinky was a deflection

25    wound from number one or two, or was it an independent

1    MR. WEIDNER:  Could we get this marked, Your Honor?

2  Q    I'm showing you DG.   Is this the 1993 edition of the

3       Physicians' Desk Reference?

4  A    Yes, it is.

5  Q    And you recognize that?

6  A    Yes, it is.

7  Q    and isn't it fair to say that what this book is, is this

8       -- this is the information that the manufacturers -- the

9       pharmaceutical companies of the drugs give out to doctors

10      so doctors can understand the possible consequences of

11      prescribing a particular drug to a patient?

12 A    That's right.

13 Q    That's basically exactly what it is, isn't it?

14 A    That's right.

15 Q    All right.  Directing your attention to page 1074.  Does

16      that refer to the drug that you prescribed?

17 A    Yes, it does.

18 Q    Voltaren?

19 A    Uh-huh (affirmative).

20 Q    And does it talk about adverse reactions to that drug?

21 A    Yes.

22 Q    And under the digestive system, what's the first adverse

23      reaction that is listed?

24 A    Diarrhea.

25 Q    Would you be kind enough to write that on the board?

AURORA COURT REPORTING

3214

1    A    Probably an hour to shortly after an hour.  I believe the

2         autopsy was started around 12:30.

3    Q    The autopsy started about 12:30, you said.  Were you

4         present before the autopsy began?

5    A    I was there before it physically began, yes.

6    Q    Okay.  And were you present when the body of Diane Wyatt

7         was placed on any table, if you remember?

8    A    I -- I can't remember if I was there when it actually got

9         placed on the table or whether it was already there.

10   Q    Who else was present in the room between Dr. Stewart when

11        the autopsy was conducted?

12   A    Corporal DeHart, my partner, Mike Gaetz from the lab,

13        Chris Beheim from the laboratory also, and there may have

14        been a few other people that came and gone (sic).

15   Q    Okay.  Looking at 119 again, you indicated that was the

16        manner in which the packaging which contained the body of

17        Diane Wyatt was positioned on the lab table?

18   A    When I saw it, yes.

19   Q    Okay.  Did you have a chance to walk around the object

20        and take a look at it in terms of how it was put

21        together?

22   A    Yes.

23   Q    And what kind of ropes or bindings do we have there?

24   A    Well, you have -- you have a blue plastic tarp.  You have

25        a -- what I call a green fishnet.  I don't know what the

AURORA COURT REPORTING

1      exact terminology -- maybe a gill net or -- or what is a

2      fish net to me.   Then you have some yellow nylon type

3      rope that -- that I commonly use for -- for tying up a

4      boat or tying up things concerned with a boat.  And then

5      you have some anchors -- two anchors and then you have

6      the chain that was attached to those anchors.

7  Q   Okay.   I show you Exhibit No. 120.   Do you recognize

8      what's contained in Exhibit No. 120?

9  A   It's the same -- it's -- it's the -- it's Diane Wyatt,

10     the way she was found.

11  Q   Is that a closer view of the packaging?

12  A   Yes, it is.

13  Q   Did you have a chance to examine the manner in which the

14     yellow rope or yellow nylon rope was attached to the net?

15  A   Yes, I did.

16  Q   How was it attached?

17  A   Well, I made -- I made note that was in my report that

18     the -- the net was actually wrapped around the blue nylon

19     -- or the blue plastic tarp.  And then the rope was

20     intermingled among the -- the net and wrapped around the

21     blue plastic tarp also.   The -- the chains from the

22     anchors were not wrapped completely around the body --

23     around the tarp.  They were kind of intermingled on the

24     same side.   Both anchors -- chains were intermingled

25     through the yellow nylon rope and the fishnet on the same

Q   Well, they're consistent with someone -- like me, for instance, cutting my hand near that box?  Shaking your hand in pain, blowing your nose?

A   There's different mechanisms that could produce that.  It doesn't have to be a violent action.  Well, something has to be applied.  You could have blood on you or -- and brush it away to produce fine spatter.

Q   And sir, it's not a pleasant subject, but if someone blows their nose, you can sometimes get blood from that act, can't you?

A   I've seen in other cases where actually victims have been shot in -- in the mouth, they were coughing and spitting up blood and you could get similar type reactions.

Q   Sure.

A   I haven't seen it in a nose situation where you're blowing your nose.

Q   If a person blows their nose, they can sometimes blow blood out with the mucus, can't they?

A   I don't think you would get a similar pattern to what we have on that box.

Q   All right.  You don't know, do you whether all the stains on that box are blood or not, even if some of them are?

A   That's correct.

Q   And you don't know if all the stains were put there at

AURORA COURT REPORTING

4286

1  Q   And how does that genotype compare with the blood type

2      of Diane Wyatt?

3  A   The genotype of Diane Wyatt, number 265, was the

4      genotype one point two two, which is the same type.

5  Q   Would you please write genotype one point two two on

6      that exhibit number 205?

7  A   (Pause).

8  Q   Based on your work in this area, based on your contact

9      with other scientists, based on your knowledge of this

10     science, what percentage of the population would be

11     limited to genotype one point two two?

12 A   The genotype one point two two is found at most in 10

13     percent of the Caucasian, Black, and Hispanic

14     population.

15 Q   Would you write that down please.

16 A   (Pause)

17 Q   Could you put it in a lay person's terms in terms of a

18     hundred people; how many probes based on the -- I don't

19     think you've given us (Indiscernible) produce that

20     blood type, that genotype (Indiscernible).

21 A   At most ten out of a hundred, or one out of ten.

22 Q   You can refer now to the cardboard box, the Carling box

23     we were referring to at least a couple of times,

24     evidence number 35, state trooper evidence number 35,

25     our evidence (sic) number 190.  Do you see that item on

AURORA COURT REPORTING

4455

1    in parenthesis.  And on number 27 would you put two

2    stars at the door to the pink room?  Finally, exhibit

3    number 20, is there a door depicted?

4  A  Yes, sir, there is.

5  Q  What door is that?

6  A  That's the door to the pink bedroom.

7  Q  Thank you.  Did you have a chance to look into that --

8    look into that room on October 23rd, 1992?

9  A  Yes, I did, I went inside that room.

10 Q  Okay, and when you went inside that room were you with

11   the defendant?

12 A  Yes, I was.

13 Q  When you spoke to the defendant did you ask him when

14   was the last time he saw his wife, Diane Wyatt?

15 A  Yes, I did.

16 Q  This was during the interview of October 23rd at 4:30 -

17   4:45?

18 A  Yes, it was.

19 Q  And what did he tell you?

20 A  Mr. Wyatt told me that he had last seen Diane Wyatt

21   Friday morning, the 23rd of October, at approximately

22   6:45 in the morning.

23 Q  Did he say where he saw her?

24 A  Yes, he did, he said she was sleeping in the pink

25   bedroom.

AURORA COURT REPORTING

4778

```
 1   Q   Did he take you into the pink room?
 2   A   Yes, he did.
 3   Q   Did you truly walk into the pink room?
 4   A   Yes, we did.
 5   Q   And where did you stand in the pink room?
 6   A   I'd asked Mr. Wyatt if had a photograph of Diane Wyatt
 7       for our search purposes, in this dresser located here
 8       in the diagram, inside the pink room, Mr. Wyatt and I
 9       went into the pink room, he opened the drawers on this
10       dresser and looked through for photographs.  As he was
11       doing so I was standing directly behind him,
12       approximately above the letter T in -- I'd say right
13       here.
14   Q   Did he indicate specifically what time it was he last
15       saw Diane Wyatt in that room?
16   A   As I recall, he said he saw her at 6:45 in the morning.
17   Q   Did he say what he did after 6:45?  I'm referring now
18       to your first interview with him on the 23rd?
19   A   Yes, he said that he closed the door to the bedroom and
20       went out about his morning routine, had breakfast and
21       then went to work.
22   Q   Did he indicate whether or not he had to open the door
23       to look in and see his wife?
24   A   As I recall he said he opened the door, looked inside,
25       saw that she was sleeping, and then gently closed the
```

AURORA COURT REPORTING

4779

1    THE COURT:  I think I have to talk to Mr. Wyatt a

2  little bit.  The Supreme Court has said that I have to make

3  sure that he understands it's his choice.

4    MR. WEIDNER:  I've been suggesting to them for years

5  that they do that.  I'm glad they finally learned.

6    (End of whispered conversation at the bench)

7  2550

8    THE COURT:  Ladies and gentlemen, I'm going to excuse

9  you for just a few minutes and then we'll have you back in

10  in time to tell you what our schedule's going to be.  Please

11  do not discuss the case amongst yourselves or with anyone

12  else.  You are excused.

13    The jury's left the courtroom.  Go off the record.

14    (Off record)

15  2603

16    (On record)

17    THE COURT:  The jury's left the courtroom.  Mr. Wyatt,

18  Mr. Weidner has indicated that he is ready to rest.  You

19  understand that you have an absolute right to testify if you

20  wish to testify?

21    MR. WYATT:  Yes, I do, sir.

22    THE COURT:  You understand that you can take the advice

23  of Mr. Weidner but ultimately it's your decision and you

24  make that decision yourself.  You understand that?

25    MR. WYATT:  Yes, sir.

AURORA COURT REPORTING

6058

1  Susan Vik, and Sven Karlsson, who he doesn't respect, who

2  don't really like him, and offers the most sensitive of

3  questions, is there another man in my wife's life?  When

4  he's asked these questions by the state trooper he said

5  well, I didn't really ask that kind of question, well I was

6  just fudging.  It's a very major fudge when you represent in

7  fact your marriage is going along fine.  He asked them if

8  there was another man in the -- in her life, and these

9  people don't respond in any way.  The conduct of Mr. Wyatt

10  of Oct -- on September 22nd suggests a person who's highly

11  desperate.  At this point in his life he's going to start

12  pursuing people or asking questions of people he doesn't

13  care for about other things in this woman's life because she

14  is changing.  Diane Wyatt is changing.  She wants out, she

15  wants to begin a life all over again without men, with her

16  own life, with her own kids, with her own home.  She wants

17  it on her own this time and she doesn't want the defendant

18  part of it, and he sees it happening.

19      The month of October we have an event that occurs.

20  October 2nd a letter is written, and you've seen the letter,

21  you heard a lot of testimony about it, to the Citicorp Bank

22  Corporation.  Now I challenge your -- your ability to come

23  up with a conclusion that that letter was written by Diane

24  Wyatt.  That letter is a forgery.  There can be no other

25  conclusion for a number of reasons, some are scientific and